**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

| | |
|---|---|
| CHARLES "RANDY" RICH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:19-cv-0022 |
| ) | |
| WITT O'BRIEN'S USVI, LLC, LEVETATED ) | |
| CAREERS, INC. and PRIME UNIVERSAL ) | |
| GROUP, LLC, ) | |
| ) | |
| Defendants. ) | |

APPEARANCES:

LEE J. ROHN, ESQ.
RHEA LAWRENCE, ESQ.
LEE J. ROHN & ASSOCIATES
ST. CROIX, U.S. VIRGIN ISLANDS
    *FOR PLAINTIFF CHARLES RICH*

ADAM G. CHRISTIAN, ESQ.
OGLETREE DEAKINS LAW FIRM
ST. THOMAS, U.S. VIRGIN ISLANDS
    *FOR DEFENDANT WITT O'BRIEN'S USVI, LLC*

KYLE R. WALDNER, ESQ.
WALDNER LAW, P.C.
ST. THOMAS, U.S. VIRGIN ISLANDS
    *FOR DEFENDANT LEVETATED CAREERS, INC.*

JENNIFER MILLER BROOKS, ESQ.
HAMILTON, MILLER & BIRTHSIEL, LLP
MIAMI, FLORIDA
    *FOR DEFENDANT PRIME UNIVERSAL GROUP, LLC*

## MEMORANDUM OPINION

**MOLLOY, Chief Judge.**

Despite the allure of the U.S. Virgin Islands, businesses sometimes struggle to find qualified employees for specialized disaster response work required on island. This dispute arises from an employment arrangement gone awry just three months after the newly hired

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 2 of 44

employee moved to St. Croix from the U.S. mainland specifically for the job he was hired to do. After an unfortunate incident on the job site, the employee was removed from his assignment and eventually terminated from his position. This lawsuit ensued.

Pending before the Court are the following:

1. Defendant Witt O'Brien's USVI, LLC's ["WOB"] Motion for Summary Judgment on Liability, filed on June 17, 2024, (ECF No. 335)[1];

2. Defendant Witt O'Brien's USVI, LLC's ["WOB"] Motion for Summary Judgment on Damages, filed on June 17, 2024, (ECF. No. 337)[2];

3. Defendant Levitated Careers, Inc.'s ["Levitated"] Motion for Summary Judgment, filed on June 17, 2024, (ECF No. 339)[3] ; and

4. Defendant, Prime Universal Group LLC's ["Prime"] Motion for Summary Judgement, filed on June 17, 2024. (ECF No. 343.)[4]

For the reasons discussed herein, the Court will grant Defendants' motions for summary judgment.

## I. BACKGROUND

### A. Factual Background

#### *The parties*

In response to an advertisement he saw in late October 2018, Plaintiff Charles "Randy" Rich reached out to Defendant Levetated Careers, Inc. ("Levetated") about a job in St. Croix, U.S. Virgin Islands.[5] Plaintiff was living in Georgia at the time, and communicated

---

[1] Plaintiff filed his opposition on July 26, 2024, (ECF No. 375), and WOB filed a reply on August 9, 2024. (ECF No. 410.)

[2] Plaintiff filed his opposition on July 26, 2024, (ECF No. 379), and WOB filed a reply on August 9, 2024. (ECF No. 412.)

[3] Plaintiff filed his opposition on July 26, 2024, (ECF No. 373), and Levitated filed a reply on August 9, 2024. (ECF No. 413.)

[4] Plaintiff filed an opposition on July 26, 2024, (ECF No. 377), and Prime filed a reply on August 9, 2024. (ECF No. 408.)

[5] Plaintiff first learned of the job with Levetated sometime after October 25, 2018. (ECF No. 416-2 at 8, 21, Pl. Dep.)

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 3 of 44

exclusively with Levetated's Hiring Manager, Jason Embry ("Embry").[6] (ECF No. 416-2 at 26, 27.) An Alabama based company, Levetated was in the business of providing employees and staffing for its clients. (ECF No. 17 ¶ 6.) Defendant Prime Universal Group, LLC ("Prime") was one of Levetated's customers. [7] *Id.* Incorporated in Texas, Prime provided "construction and project controls" services.[8] (ECF No. 449-4 at 4, 17.) Prime contracted with Levetated to hire employees to perform work for Defendant Witt O'Brien USVI, LLC ("WOB") on St. Croix. (ECF No. 17 ¶12 and ECF No. 342 ¶¶5, 10.) WOB is a private entity engaged in disaster response, and it needed Quality Assurance Inspectors for "the Step Program"— a project in the Virgin Islands. (ECF No. 17 ¶3 and ECF No. 168 ¶3.)

### The Step Program

In September 2017, back-to-back Category 5 Hurricanes Irma and Maria devastated the U.S. Virgin Islands. Thousands of homes were severely damaged or destroyed, and many residents and citizens were left without viable shelters. (ECF No. 17 ¶9.) As part of the recovery effort, WOB contracted with the Virgin Islands' Public Financing Authority in November 2017 to assist the Government of the Virgin Islands in coordinating with the U.S. Federal Emergency Management Agency ("FEMA").[9] (ECF No. 296 at 3 and ECF No. 342 ¶1.) The Virgin Islands Sheltering and Temporary Essential Power Program—the "STEP Program"— was part of that effort. The program was funded by FEMA and administered by the Virgin Islands' Housing Finance Authority ("VIHFA"). (ECF No. 296 at 3 and ECF No. 342

---

[6] Plaintiff had at least three phone conversations with Embry, and they also communicated via email. (ECF No. 416-2 at 26, Pl. Dep.)

[7] Prime's CEO and majority co-owner is Gabriel Hilario. (*See* 342-2 at 2, Hilario Dep.) "[Levetated] had an agreement with [Prime] to provide staffing services to its operations in the U.S. Virgin Islands from approximately February 2018 to September 2019." *Id.* at 17.

[8] "Project controls consists of getting the project . . . that a government entity would want and estimating the cost of the project; . . . putting it on a work schedule and then compiling a budget to complete the project; and then as project controls [managing] all costs for that." (ECF No. 449-4 at 4, Hilario Dep.)

[9] "[Non-party WOB LLC] would later assign all rights, interests, and obligations under the contract to its Virgin Islands subsidiary, WOB USVI." (ECF No. 342 at 1n.1.) "On April 8, 2018, WOB officially assigned all of its 'rights, title and interest in and to the Contract' to WOB USVI." (ECF No. 296 at 3.)

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 4 of 44

¶¶2,3.) WOB coordinated various aspects of the STEP Program for VIHFA, including compliance with FEMA guidelines. *Id.*

### *Teaming agreements*

On January 11, 2018, Levetated and Prime entered into a Teaming Agreement "to develop and submit a single proposal as independent contractors, with Prime as the prime contractor and Levetated as a subcontractor, in response to the [V.I.] Government's Solicitation No. P0180001-VI-FEMA-FTE (the "STEP RFP")." (ECF No. 342 ¶4.) Through their agreement, Levetated and Prime provided Quality Assurance Inspectors ("QA Inspector(s)") to WOB for work with the STEP program. (ECF No. 342-1 at 21, Embry Dep.) Levetated "was to 'actively recruit for contingent hire positions, capture letters of commitment from potential candidates, and make available identifying information for all qualified candidates for use in the proposal. . . .'" (ECF Nos. 342 ¶7, 376 ¶7.) WOB entered into a Master Subcontractor Agreement with Prime on January 25, 2018. (ECF No. 296 at 3.) WOB "engaged Prime to provide experienced construction professionals" to perform inspections for VIHFA. (ECF No. 336 at 2.)

### *Plaintiff hired*

Within one week after learning of the job with Levetated in St. Croix, Plaintiff accepted an offer from Levetated and was on the ground in the U.S. Virgin Islands. (*See* ECF No. 17 ¶17.) Plaintiff accepted the offer on October 29, 2018. (ECF No. 341-2 at 22,23, Pl. Dep.) Levetated hired Plaintiff for a three-month assignment as a QA Inspector. *Id*. at ¶33. Plaintiff was informed via email from Embry that he had been hired, and he traveled to St. Croix on November 1, 2018. *Id*. at ¶¶17, 18. Plaintiff began work straight away with Prime for WOB as a QA Inspector on the STEP Program. *Id.* But before making the move to St. Croix, Plaintiff signed an applicant waiver acknowledging that he was hired as an at-will employee.[10] As

---

[10] Levetated's Applicant Waiver states:

> The Company reserves the right to terminate employees without prior warning. This application does not create an employment contract between you and Levetated Careers, Inc. *Your employment is at will*[.]

(ECF No. 341-1) (emphasis added).

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 5 of 44

part of his onboarding with Levetated, Plaintiff also signed a Non-Compete Agreement that prohibited him from competing with Levetated or Prime to provide labor in the U.S. Virgin Islands. *Id.* at ¶20. In addition, Plaintiff was required to "read and initial Prime's Human Resources policies and was told his work was governed by the policies and procedures of Prime." *Id.* at ¶21. Plaintiff also received rules to follow for when he was off duty in St. Croix, and he was informed that he was "a 24 hours/per day representative of WOB, and to conduct himself accordingly on and off the clock." *Id.* at ¶28. Plaintiff wore WOB's photo identification badge, and he was held out to the public as a QA Inspector for WOB. *Id.* at ¶24. However, "[n]either Plaintiff nor any other [QA] Inspector, signed any employment agreement or other documents with WOB." (ECF No. 336 at 2.) While on the job in St. Croix, Plaintiff was supervised by Arthur Valadez ("Valadez") and others on behalf of Prime. (ECF No. 342-3 at 18, Levetated's Resp. to Pl.'s Interrog.)

Plaintiff's housing and transportation were managed by Prime and his payroll direct deposits and time keeping were handled by Levetated. (ECF No. 17 ¶¶ 26, 27.) Levetated reimbursed Plaintiff the cost of his airfare to and from the project location in St. Croix. (ECF No. 342-3 at 17.) Lodging was provided free of charge to Plaintiff. *Id.* In addition to housing, Plaintiff earned $30 per hour plus $400 per week as an allowance for meals and incidental expenses. *Id.* He also received time and a half pay for all hours over 40 hours per week, plus shared paid transportation. (ECF No. 17 ¶30.) His hours of work were "as needed" but he was asked to work 40 to 80 hours per week. (ECF No. 342-3 at 17, 18.)

### Altercation and termination

During off-duty hours sometime in January 2019 during Plaintiff's third month on the job, Plaintiff and another Levetated employee, Hugh Shows, entered into "a friendly bet on a football game for $20." (ECF No. 17 ¶34.) Plaintiff won the bet, and Shows paid as agreed. *Id.* But "[a]bout one or two weeks later," the two entered another bet and this time Shows did not pay. *Id.* at ¶35. The relationship then came to a hostile head. *Id.* at ¶¶35-37, 42. Before going to work on the morning of January 26, 2019, Plaintiff became aware of menacing texts sent by Shows the previous evening threatening to "beat him up." The following is part of the text exchange that took place between Plaintiff and Shows on January 25, 2019:

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 6 of 44

PLAINTIFF:   Time to pay up the 100 Hugh. Thank you sir. Good
             thing I talked you out of the 500 bet! (6:09 p.m.)

SHOWS:       Dude what the fuck did I tell you??? (6:25 p.m.)
             I'm gonna fuck you up tomorrow morning
             I'm gonna smash you [*sic*] fucking jaw you fuck!!! (6:26 p.m.)
             You must've thought I was joking.... I wasn't!!! (6:27 p.m.)
             Matter of fact where the fuck are you right now (6:29 p.m.)
             What....now you don't wanna talk??? (6:41 p.m.)
             You fucking pussy!!!! I'ma get you. (8:09 p.m.)
             I'm coming for you you dumb fuck!!!!! (9:39 p.m.)
             Answer the phone you fucking pussy
             You fucking pussy
             I'll see you in the morning bitch..... Hope your ready for me
             Pussy ass bitch !!! (9:43 p.m.)
             You fucked with the wrong one......I told you not to, but no........now
             you've got it coming!!!!!! (9:44 p.m.)
             Fucking coward!!!!!!!!
             See ya in a little while you fuck!!!!! (10:29 p.m.)

(ECF No. 449-8.)

After arriving to work shortly before 7:00 a.m. on the following morning of January 26, Plaintiff showed the texts to Valadez and expressed that he believed Shows wanted to harm him. (ECF No. 17 ¶39.) Valadez instructed Plaintiff to stay away from Shows. (ECF No. 342-7 at 13.) He also told Plaintiff that "any issues could cost him his job." *Id.* Valadez took no further action.

Within less than an hour of reporting the texts and while Plaintiff was waiting to be driven to his designated job site for the day, "Shows appeared about 30-40 feet from the vehicle" that Plaintiff was sitting in. (ECF No. 17 ¶42.) Although the two initially attended the morning muster without event, an altercation ensued.[11] One of the inspectors reported the incident to Gregory Elizondo ("Elizondo") of Prime, who was in a nearby office at the time.

---

[11] The altercation between Plaintiff and Shows occurred at approximately 7:12 am. (ECF No. 347-2 at 6, Pl. Dep.) Plaintiff states that on a daily basis he generally entered a vehicle every morning around 6:15 or 6:30 and was driven to the "headquarters" to wait for assignments at "around 7 am." *Id.* at 5.

(ECF No. 342-8 at 4, Elizondo Dep.) He was told that the two men engaged verbally, that

Plaintiff "flicked" Shows off, and Shows reacted.[12] *Id*. at 8. Shows' account does not differ:

> I dropped my bag and took out in a sprint. I headed for him. I was going to punch him right in the face, but he rolled the window up and locked the door, and I noticed that the driver's side door -- he was sitting in the passenger seat. The driver's side window was down, so I ran around to the other side of the vehicle and reached in and unlocked the door, because he had locked it with the electric lock, and I reached in and unlocked the vehicle and opened the door and I reached across the vehicle and grabbed him by the shirt and was about to drag him out when the CM came out to the vehicle and got between us."

(ECF No. 449-3 at 9, Shows Dep.)

The two were quickly separated and Shows was removed from the scene.[13] (ECF Nos. 376 ¶122, 17 at ¶¶45.) Shows claims he never punched Plaintiff. (ECF No. 449-3 at 9.) Plaintiff claims he was struck twice in the face and never gestured at Shows. (ECF No 449-1 at 3, Pl. Dep. ) Plaintiff was told to return to his room, and he asserts that a few hours later, he "was told to pack his bags, he was fired, and he would need to fly out that day."[14] (ECF No. 17 at ¶¶ 47, 51.)

Plaintiff now alleges that he was wrongfully discharged. *Id.* at ¶56. According to Plaintiff, if Valadez had properly addressed the texts that Plaintiff showed him on the

---

[12] Elizondo immediately went outside, and Plaintiff was still in the car. (ECF No. 342-8 at 4,5.) "I asked [Plaintiff] what happened, and I believe he stated to me that there was a bet or something going on about a Super Bowl and one of them was supposed to be paying each other, and before the incident occurred there was some—some yelling at each other before the incident, and then a hand gesture and, at that point , it escalated." *Id.* at 7. "Hugh Shows had ran to the vehicle and was -- was trying to, I guess, pull him out of the vehicle." ECF *Id*. at 5. Elizondo instructed Plaintiff to leave the job site after the altercation, and he drove Plaintiff back to his room. Elizondo stated that he saw no scrapes or scratches on Plaintiff or any other bodily injury. *Id.* at 6.

[13] Prime CEO Hilario stated that shortly after the incident between Plaintiff and Shows he received a call from Valadez telling him that "[Plaintiff] and Shows were in an altercation, and. . . they were separated, and Mr. Folkestad [of WOB] is requesting to remove him off the island. And I said, okay, that they'd have to get in touch with Embry [of Levetated]. I told [Valadez to] get in touch with Embry and arrange demobilization." (ECF No. 342-2 at 14, Hilario Dep.)

[14] After his removal, Plaintiff received a letter from Embry on January 26, 2019, stating that his "assignment has been ended." Plaintiff understood that to mean that his employment with Levetated had been terminated. (ECF No. 449-1 at 46, Pl. Dep.) Plaintiff filed the instant lawsuit shortly after he was removed from the project and never requested another assignment from Levetated. It was Plaintiff's "assumption that because of the lawsuit, that Levetated would not be willing to entertain any further assignments." *Id.*

morning of the altercation, he "would not have been attacked by Shows," and he would not have been terminated from his job as a QA Inspector with the STEP program in St. Croix. *Id.* at ¶59. Plaintiff further asserts that all three Defendants—not just Levetated—were his co-employers, and that his at-will employee status was modified by alleged promises of future work. *Id.* at ¶19.

Plaintiff contends that "on or about October 29, 2018," during his early discussions with Embry, Plaintiff was told that if he moved to St. Croix for the job with Levetated, and if he "worked well," there would be more work for him in the U.S. Virgin Islands and on the mainland beyond the three-month initial assignment. *Id.* at ¶¶17, 33, 55. Plaintiff asserts that Embry made this assurance during their phone conversations before Plaintiff accepted the job with Levetated. In addition, Plaintiff alleges that representatives of Prime and WOB also assured him of future work. *Id.* According to Plaintiff, Prime's CEO Gabriel Hilario assured him of future work after Plaintiff had already accepted Levetated's job offer and had started working in St. Croix.[15] (ECF Nos. 17 ¶¶33, 55, 347-2 at 2.) Plaintiff avers that he would not have accepted Levetated's three-month contract offer in October 2018 if he had believed the job was only going to be for three months.

For their part, Prime and Levetated do not deny discussing the potential for additional work beyond Plaintiff's initial commitment; however, Defendants maintain that Plaintiff was hired as an at-will employee by Levetated to work as a QA Inspector for the STEP program for an initial temporary three-month assignment without further commitment from Defendants. (ECF No. 336 at 2.) Defendants further contend that they are each individually independent contractors, and that Plaintiff was hired solely by Levetated, and contracted out for work through Prime to WOB. *Id.*

As a result of being terminated from his job, Plaintiff alleges that he suffered harm of "loss of income, inability to pay on contracts for purchase, inability to pay chapter 13 payments, other economic damages, mental anguish, suffering and loss of enjoyment of life,

---

[15] In his First Amended Complaint, Plaintiff alleged that in addition to Levetated and Prime, WOB had also "represented to Plaintiff that when it moved on to other disaster recovery jobs, he could have work with them in other locations, which Plaintiff relied upon." (ECF No. 17 ¶55.) However, Plaintiff fails to name anyone specific with WOB or to provide evidence in support of this allegation against WOB.

all of which are expected to continue into the foreseeable future." (ECF No. 17 ¶62.) Plaintiff further asserts that he would not have relocated to St. Croix to work for Defendants and started "buying real estate, and establishing a life in St. Croix" had he known that Defendants "would ignore warnings about his safety on the job and then wrongfully discharge him for complaining about the workplace violence that he suffered." *Id*. at ¶55.

### B.  Procedural Background

This case was removed from the Superior Court of the Virgin Islands in May 2019. (*See* ECF No. 1.) Plaintiff filed a First Amended Complaint on June 17, 2019, alleging the following causes of action: (1) Fraudulent and/or Negligent Misrepresentation against all defendants (Count One); (2) Tortious Interference with Contracts against WOB (Count Two); (3) Tortious Interference with Contracts against Prime (Count Three); (4) Collusion against all defendants (Count Four); (5) Negligent Retention of Hugh Shows against all defendants (Count Five); and (6) Breach of Duty of Good Faith and Fair Dealing against WOB and Prime (Count Six). (ECF No. 17.) Defendants filed motions to dismiss in July and August of 2019. (*See* ECF Nos. 18, 19, 64.) In October 2023, the Court adjudicated the motions to dismiss, reducing the number of claims against Defendants to: (1) Fraudulent Misrepresentation as to Prime and Levetated (Count One); and (2) Negligent Retention against all defendants (Count Five). (*See* ECF Nos. 143, 144.) Defendants filed the instant motions for summary judgment in June of 2024.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the evidence offered demonstrates that there is no genuine issue of material fact in dispute and no jury could reasonably find that the non-moving party is entitled to judgment in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment is appropriate only where "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment has the initial burden of demonstrating a lack of a genuine issue of fact. *Celotex* 477 U.S. at 323. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). A dispute is

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 10 of 44

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party; if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 244.

Once the moving party meets its initial burden, the non-moving party then has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Anderson* at 255.) "The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

The nonmoving party is required to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c) and (e)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Similarly, a party opposing summary judgment must do more than just "rest upon mere allegations, general denials, or vague statements." *Trap Rock Indus. v. Local 825*, *Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890 (3d Cir. 1992) (citation omitted). Rather, the nonmoving party must offer specific evidence found in the record which contradicts the evidence averred by the movant and indicate that there is a genuine issue for trial. Fed R. Civ. P. 56. If the adverse party does not so respond, the court, if appropriate, will enter summary judgment. The United States Supreme Court previously declared that Federal Rule 56 ". . . mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.

With these concepts in mind, the Court turns to the merits of Defendants' motions.

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 11 of 44

## III.    DISCUSSION

Defendants contend that Plaintiff fails to demonstrate a genuine dispute of material fact as to either of Plaintiff's remaining causes of action against Defendants: Fraudulent Misrepresentation (Count One) as to Defendants Levetated and Prime, and Negligent Retention (Count Five) as to all three Defendants.[16] According to Plaintiff, Defendants enticed him to move to St. Croix with false promises of continued work, which Plaintiff relied upon. Plaintiff alleges that Defendants failed to provide a safe workplace and negligently retained Shows after he texted threatening messages to Plaintiff.[17] Plaintiff asserts that if

---

[16] As noted by Levetated, (ECF No. 413), Plaintiff advances additional claims that are either not found in the First Amended Complaint or were previously disposed of by the Court. These include claims for (i) breach of the implied duty of good faith and fair dealing, (ii) promissory estoppel, and (iii) a brand-new claim that Levetated is liable to Plaintiff for alleged negligent retention of Arthur Valadez. [ECF No. 373 at 10-11, 18-19.] The Court disallows the negligent retention claim as to Arthur Valadez at this late stage because Plaintiff had plenty of opportunity to raise it earlier and did not. The Court previously denied Plaintiff's motion to add the promissory estoppel claim when it denied Plaintiff's motion to amend its complaint. (*See* ECF Nos. 173 and 311.) Plaintiff's claim for breach of the implied duty of good faith and fair dealing was previously disposed of by the Court at ECF No. 143. Plaintiff also raises untimely claims of defamation, (ECF No. 375 at 16), and self-defense, (ECF No. 447 at 7), which are also disallowed at such late juncture.

[17] Plaintiff asserts that "Defendants violated OSHA regulations," (ECF No. 379 at 8), and invokes standards under the Occupational and Safety Health Act ("OSHA") asserting that Defendants violated the Act by failing to provide a safe working environment, and failing to prevent workplace violence after Plaintiff reported the threatening texts. (ECF No. 17 ¶50.) Plaintiff asserts that Valadez "did not respond to the issue. . . and terminate Shows upon seeing the threatening messages towards Plaintiff." *Id.* at ¶40. Plaintiff further asserts that the texts represented a "clear potential danger to Plaintiff and others in the workplace in violation of OSHA." *Id.* However, there are currently no specific OSHA standards for workplace violence. S*ee Davis v. Vanderbilt Univ. Med. Ctr.*, No. M2019-01860-COA-R3-CV, 2020 Tenn. App. LEXIS 349, at *9 (Ct. App. Aug. 5, 2020) ("The OSHA workplace violence guidelines are not statutory provisions or regulations; they are non-mandatory guidance only.") Notwithstanding, OSHA defines workplace violence as "any act or threat of physical violence, harassment, intimidation, or other threatening disruptive behavior that occurs at the worksite." *See* Occupational Safety and Health Administration: Workplace Violence, https://www.osha.gov/workplace-violence (last visited February 5, 2026).

Under OSHA's General Duty Clause, "employers are required to provide their employees with a place of employment that is 'free from recognized hazards that are causing or are likely to cause death or serious physical harm.'" *Id.* Plaintiff points out that Section 5(a)(1) of OSHA's General Duty Clause "requires employers to provide a safe and healthful workplace for all workers covered by [the Act]." (ECF No. 17 ¶49.) But OSHA standards do not, by their own force, apply to Plaintiff. OSHA does not establish a private right of action, and Plaintiff did not file a complaint with OSHA. *See Figgs v. Bellevue Holding Co.*, 652 A.2d 1084, 1091 (Del. Super. Ct. 1994) ("Furthermore, this Court reiterates the consensus that OSHA does not establish a private right of action and, therefore, plaintiff cannot seek relief [against Defendant] under the act. *See* 29 U.S.C. § 653(b)(4); 79 ALR3d 962, § 3. . . . Rather, plaintiff's causes of action are limited to common law tort claims."); *see also Jeter v. St. Regis Paper Co.,* 507 F.2d 973, 977 (5th Cir. 1975) ("It seems clear that Congress did not intend OSHA to create a new private cause of action but, on the contrary, intended private rights to be unaffected thereby."); *Hare v. Fed. Compress & Warehouse Co.,* 359 F. Supp. 214, 218-19 (N.D. Miss. 1973) (finding regulation violation pursuant to OSHA in a cause of action by subcontractor's employee could not "be used as a vehicle to fasten

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 12 of 44

Shows had been removed from the premises or terminated the morning of January 26, 2019, he would not have lost his job and would not have suffered aggregate economic losses as a result of losing his job.

In response, Defendants maintain Plaintiff was hired as an at-will employee, and therefore could be fired at any time for any reason. Furthermore, according to all three Defendants, prior to the morning of the incident between Shows and Plaintiff, they had no actual or constructive knowledge that Shows possessed any propensity for violence.

While Plaintiff's remaining claims assert causes of action for fraudulent and/or negligent misrepresentation and negligent retention, integral to elements of each claim and its disposal is the issue of whether Plaintiff was an at-will employee. While not explicitly plead, Plaintiff is challenging his termination under the guise of negligent retention. A finding that in fact, Plaintiff was an at-will employee, is fatal to both of Plaintiff's claims. Therefore, the Court first discusses the at-will doctrine and then analyzes its impact within each cause of action.

---

liability" upon defendant general contractor); 35 A.L.R. Fed. 461 ("[OSHA] does not create a private cause of action for violations of the Act or the regulations thereunder" or "create a private cause of action for damages based on a violation of OSHA.").

To the extent Plaintiff premises Defendants' duties on OSHA, the Act states "Nothing in this Act shall be construed. . . to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries. . . of employees arising out of, or in the course of, employment." 29 U.S.C. § 653(b)(4). "Application of the general duty clause of the Occupational Safety and Health Act does not depend upon advisory workplace violence guidelines. Rather, the general duty clause applies in the absence of specific regulations. A violation of the general duty clause requires proof of the following elements: (1) an activity or condition in the employer's workplace presented a hazard to an employee, (2) either the employer or the industry recognized the condition or activity as a hazard, (3) the hazard was likely to or actually caused death or serious physical harm, and (4) a feasible means to eliminate or materially reduce the hazard existed." *Davis*, 2020 Tenn. App. LEXIS 349, at *1) (citation omitted). *See also Safeway, Inc. v. OSHRC*, 382 F.3d 1189, 1195 (10th Cir. 2004) ("To show a violation of the general duty clause, the Secretary must prove: (1) that the employer failed to render its workplace free of an obvious and recognized hazard; (2) the hazard was causing or likely to cause death or serious physical harm; and (3) there was a feasible method by which the employer could have abated the hazard."). "The courts have interpreted OSHA's general duty clause to mean that an employer has a legal obligation to provide a workplace free of conditions or activities that either the employer or industry recognizes as hazardous and that cause, or are likely to cause, death or serious physical harm to employees when there is a feasible method to abate the hazard." Workplace Violence Enforcement, https://www.osha.gov/workplace-violence/enforcement (last visited February 5, 2026). Show's texts were sent off-site during off-duty hours, and the Court finds it a stretch to classify those texts as an "activity or condition" that presented a hazard "likely to cause death or serious physical harm" for which the industry or Defendants recognized as such a hazard.

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 13 of 44

### A. Plaintiff was hired as an at-will employee.

An at-will employee is "an individual whose employment could be terminated at any time, without cause." *Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 201 (3d Cir. 2014); *see also Canton v. V.I. Humanities Council*, No. ST-12-CV-279, 2017 V.I. LEXIS 116, at *15 (Super. Ct. July 26, 2017) ("At-will employment means an employer or employee can terminate their employment relationship at any time and for any reason not prohibited by statute or for no reason at all."); *Terrell v. Main Line Health, Inc.*, 320 F. Supp. 3d 644, 659 n.17 (E.D. Pa. 2018) ("Absent discrimination, an employee-at-will can be fired for any reason or no reason.").

Here, Plaintiff concedes that he signed two agreements acknowledging that he was hired as an at-will employee.[18] Plaintiff signed Prime's "General Handbook Acknowledgement," which states in relevant part:

> I further understand that my employment is terminable at will, either by myself or the Company, with or without cause or notice, regardless of the length of my employment or the granting of benefits of any kind.

(ECF No. 342-5 at 42.)

In addition, Plaintiff signed an Applicant Waiver with Levetated on October 29, 2018, that specifically stated in relevant part:

> The Company reserves the right to terminate employees without prior warning. This application does not create an employment contract between you and Levetated Careers Inc. Your employment is at will, Levetated Careers Inc. has the right to modify its policies at any time.

---

[18] Plaintiff admits that he signed an at-will employment agreement at the outset of his employment but alleges that he did not read the applicant waiver "word for word." (ECF No. 341-2 at 26, 27.) Failure to read before signing is no defense to a contractual obligation. "It is axiomatic that a party's failure to properly read a contract before executing it does not nullify the contractual terms contained in the document because the terms remain binding on the individual who failed to read the contract. Courts have long required contracting parties to act with reasonable prudence by reading the document prior to signing it because failure to read a contract is not grounds for rescinding it unless the failure is justified by special circumstances." *Love Peace v. Banco Popular de P.R.*, 75 V.I. 284, 285 (2021). The Court finds no "special circumstances" here. "Every contracting party has the duty to learn and know the contents of a contract before he signs and delivers it." *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 222 (3d Cir. 2008) (quotation marks and citation omitted); *see also Upton v. Tribilcock,* 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law."); *Cotto v. Hess Oil V.I. Corp.*, No. 1984/318, 1985 U.S. Dist. LEXIS 12137, at *5 (D.V.I. Nov. 1, 1985) ("A party to a contract on which others have relied cannot avoid the duties of the document by showing they did not know its contents. . . .").

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 14 of 44

(ECF No. 370-10.)

"Whether the evidence is sufficient to overcome the at-will presumption is a question of interpretation normally left to the court." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 660 (3d Cir. 1990) (citations omitted). In order to rebut the presumption of at-will employment, a party must establish one of the following: (1) an applicable recognized public policy exception; (2) an agreement for a definite duration; (3) an agreement specifying that the employee will be discharged for just cause only; or (4) sufficient additional consideration. *See Lord v. Erie Cty.*, 476 F. App'x 962, 967 (3d Cir. 2012) (citation omitted). The Court recognizes two possible exceptions to the at-will doctrine: 1) violation of the Virgin Islands Wrongful Discharge Act ("VIWDA") and 2) public policy exception. The Court addresses the applicability of these exceptions to the matter at hand.

### 1. *Virgin Islands Wrongful Discharge Act is not applicable*

The Virgin Islands Wrongful Discharge Act provides nine grounds under which an employer may lawfully dismiss any employee.[19] 24 V.I.C. § 76. An employer is prohibited from firing an employee for any reason not listed under section 76(a), and "[a] presumption exists that an employee has been wrongfully discharged if discharged for any reason other than those listed in § 76(a)." *Maynard v. Rivera*, 675 F.3d 225, 244 (3d Cir. 2012) (citations omitted). An at-will employee is "an individual whose employment could be terminated at any time, without cause, as long as the termination does not violate the Virgin Islands Wrongful Discharge Act. Therefore, an at-will employee can be terminated at any time for

---

[19] 24 V.I.C. § 76. Grounds for discharge.
(a) Unless modified by union contract, an employer may dismiss any employee:
(1) who engages in a business which conflicts with his duties to his employer or renders him a rival of his employer;
(2) whose insolent or offensive conduct toward a customer of the employer injures the employer's business;
(3) whose use of intoxicants or controlled substances interferes with the proper discharge of his duties;
(4) who willfully and intentionally disobeys reasonable and lawful rules, orders, and instructions of the employer; provided, however, the employer shall not bar an employee from patronizing the employer's business after the employee's working hours are completed;
(5) who performs his work assignments in a negligent manner;
(6) whose continuous absences from his place of employment affect the interests of his employer;
(7) who is incompetent or inefficient, thereby impairing his usefulness to his employer;
(8) who is dishonest; or
(9) whose conduct is such that it leads to the refusal, reluctance or inability of other employees to work with him. 24 V.I.C. § 76.

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 15 of 44

any or even no reason." *Edwards v. Marriott Hotel Mgmt. Co. (V.I.), Inc.*, No. ST-14-CV-222, 2015 V.I. LEXIS 13, at *1 (Super. Ct. Jan. 29, 2015) (citing *Greene*, 557 F. App'x at 201). "As a result, the WDA amounts to a 'statutory abrogation of the common law rule of at-will employment applicable in the Virgin Islands.' . . . While an employer is prohibited from firing an employee for any reason not listed, the WDA 'cover[s] all or almost all legitimate reasons for discharge.'" *Maynard*, 675 F.3d at 229 (citations omitted); *accord Del Valle v. Officemax N. Am.*, 680 F. App'x 51, 61 (3d Cir. 2017); *see also Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 542 (2015) (same) (quoting *Maynard*). However, the VIWDA does not cover an employee "who has been employed by an employer for less than six (6) calendar months." 24 V.I.C. § 62. Plaintiff was employed less than six months. Accordingly, as a matter of law, his termination—for any reason or no reason at all—did not violate the VIWDA, and thus, Plaintiff cannot assert any claim that he was wrongfully terminated by either defendant.

### 2. *No public policy exception applies*

Some courts recognize "a narrow exception" to the employment-at-will doctrine.[20] *Wallick v. AT&T Commc'ns*, CIVIL NO. 87-1007 (GEB), 1991 U.S. Dist. LEXIS 21601, at *33 (D.N.J. July 23, 1991). "As a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship. Exceptions to this rule are

---

[20] For example, the Tenth Circuit has held that to establish a public policy exception, a plaintiff must show:

> (1) the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege;
> (2) the action directed by the employer would violate a specific statute related to public health, safety, or welfare, or would undermine a clearly expressed policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker;
> (3) the employee was terminated as the result of refusing to perform the act directed by the employer; and
> (4) the employer was aware that the employee's refusal to perform the act was based on the employee's reasonable belief that the directed act was unlawful.

*See Donez v. Leprino Foods, Inc.*, No. 21-1212, 2022 U.S. App. LEXIS 4507, at *1 (10th Cir. Feb. 18, 2022). In *Donez,* Plaintiff worked as a foreperson for Leprino Foods ("Leprino"). While at work, another Leprino employee pushed Plaintiff, who pushed the co-worker in response. The co-worker then knocked Plaintiff unconscious. As a result, Plaintiff suffered an injury around the neck area and the back of his head. Leprino fired both employees and Plaintiff sued. Among other allegations, Plaintiff alleged Leprino fired him based on exercising his right to self-defense in violation of Colorado law. The district court granted summary judgment for Leprino and the 10th Circuit affirmed.

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 16 of 44

recognized only in the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy."[21] *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 613 (3d Cir. 1992). "The public policy violated must be clear and specific before the court will uphold the cause of action." *Id.* at 618; *see also Novosel v. Nationwide Insurance Co.*, 721 F.2d 894, 898 (3d Cir. 1983) (holding an employee-at-will has no claim against his employer for wrongful discharge except where the employment termination violates a significant and recognized public policy).[22]

Although an employer's power to terminate "at will" is not absolute, as long as the termination is not in bad faith and does not violate public policy, an at-will employee may be discharged for any reason—or lack of reason.[23] As noted in *Brunner v. Abex Corp.*, 661 F. Supp. 1351, 1357 (D.N.J. 1986), the public policy exception stems from "concern for the professional who in an at-will employment setting was told to perform an act clearly violative of some statutory law, administrative rule, judicial decision, or code of professional

---

[21] The VIWDA was enacted by the territorial legislature in 1986, but even prior, any plaintiff bringing an action under the public policy exception to the employee-at-will doctrine in the Virgin Islands was required to demonstrate that the discharge was "contrary to a clear mandate of public policy." *See Alvarez v. Pueblo Int'l*, 24 V.I. 141, 145 (1989).

[22] Courts allow lawsuits for wrongful termination on public policy grounds "when the dismissal was itself based on an unlawful ground or otherwise subverted the law. . . . " *McDaniel v. Am. Red Cross, Johnstown Region*, 58 F. Supp. 2d 628, 630 (W.D. Pa. 1999)(citing *Woodson v. AMF Leisureland Centers, Inc.,* 842 F.2d 699, 702 (3d Cir. 1988). *See, e.g., Sorge v. Wright's Knitwear Corp.*, 832 F. Supp. 118 (E.D. Pa. 1993) (under Pennsylvania law, discharge for reporting safety violations to OSHA would violate public policy embodied in federal statute protecting employees who voluntarily file complaints under Occupational Safety and Health Act). In contrast, when the public policy claimed to be violated is not "clear," a cause of action for wrongful discharge has not been recognized. *See E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436 (Del. 1996) (refusing to recognize a public-policy exception where the employee was discharged after raising concerns about a possible conflict of interest created by his supervisor's relationship with another medical imaging technology firm, noting that "employees who seek protection from firing on the basis that their actions were protected by a public policy, must assert a public interest recognized by some legislative, administrative, or judicial authority, and the employee must occupy a position with responsibility for that particular interest.") (citation omitted).

[23] The Court notes that, "[t]erminations motivated by bad-faith include only those breaches that also violate the covenant of good-faith and fair dealing." *Park v. Ga. Gulf Corp.*, Civil Action No. 91-569 (RRM), 1992 U.S. Dist. LEXIS 16044, at *36 (D. Del. Sep. 14, 1992). "Any other reading would essentially force employers to recognize in every employment contract an implied contractual pledge to provide cause for every discharge, thus obscuring, if not mutilating, the concept of at-will employment." *Id.* at *36. In 2023, this Court held that Plaintiff's claim for breach of the covenant of good-faith and fair dealing in this matter lacked merit. *See Rich v. Witt O'Brien's, LLC*, No. 1:19-cv-0022, 2023 U.S. Dist. LEXIS 179856 (D.V.I. Oct. 5, 2023).

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 17 of 44

conduct." The idea is to encourage professionals not to succumb to employment pressure. "[A]n employer may not discharge an at-will employee for acting pursuant to the clear mandate of public policy." *Id.* Significantly, however, "unless an employee at-will identifies a specific expression of public policy, he may be discharged with or without cause." *Id*. For the purposes of a tort action, the Third Circuit defines a "clearly mandated public policy" as one that "strikes at the heart of a citizen's social right, duties and responsibilities." *Novosel*, 721 F.2d at 899 (citation omitted).

Plaintiff raises an untimely claim of self-defense as a public policy exception to Plaintiff's at-will termination.[24] First, the Virgin Islands does not have a clear public policy providing for self-defense as an exemption to the employment at-will doctrine. The Court is unable to glean such a public policy from any Virgin Islands statute, rule, regulation or case law. Second, it is generally recognized that the public policy of a State or territory should be declared by its legislature and not the courts. *See Manchester v. Rzewnicki*, 777 F. Supp. 319, 326 (D. Del. 1991), *aff'd,* 958 F.2d 364 (3d Cir. 1992) ("[I]t is for the legislature, and not the courts, to declare the public policy of the state."); *see also Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 980 n.7 (2011) ("[I]t is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations.") (citing *Program Admin. Servs. v. Dauphin Cty. Gen. Auth.*, 928 A.2d 1013, 1017-18 (Pa. 2007)).

The Virgin Islands legislature has spoken when it enacted the VIWDA and established a clear public policy allowing seven enumerated reasons for a Virgin Islands employer to discharge an employee. Notably, as mentioned above, an employee must have been employed for at least six months to fall under the statute. More importantly, self-defense is not listed as an exception to any of these enumerations or to the six-month employment criteria. Thus, because there is no clear and specific public policy in the Virgin Islands

---

[24] Plaintiff belatedly raises the passing possibility of a public policy violation as an exception to termination at will in Plaintiff's Supplemental Brief filed on January 17, 2025. (ECF No. 447 at 7.) Plaintiff states that "[t]he policy favoring the right to self-defense applies here, and Plaintiff could not be lawfully terminated if he defended himself during the attack." *Id.* Plaintiff provides no evidence —or authority—to support his untimely claim of a public policy violation based on self-defense exception to an at-will termination. The Court notes that a public policy claim was not raised in Plaintiff's First Amended Complaint or any of Plaintiff's oppositions to Defendants' motions for summary judgment. (*See* ECF Nos. 17, 373, 375, 377, 379.) Further, Plaintiff does not specify what actions of self-defense were taken, if any.

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 18 of 44

allowing for self-defense to be recognized as an exception to the at-will employment doctrine, Plaintiff cannot rely on such an exception to his at-will employment status.

### 3. *No modification of at-will status by agreement*

Plaintiff next argues that "any employee at-will status that existed between Plaintiff and Levetated due to Levetated's Applicant Waiver was modified" by verbal promises of future work. (ECF No. 373 at 14). Plaintiff asserts that he relied on promises made by Embry in making his decision to fly to St. Croix days later to begin working for Prime. (ECF No. 17 ¶¶ 55, 65.)

Plaintiff cites to *Canton v. Humanities Council*, for the premise that an at-will employment relationship may be modified, and indeed "like other terms of an employment agreement, parties can agree to modify an employment relationship's at-will status, such as by promising only to terminate the relationship for just cause." 2017 V.I. LEXIS 116, at *15. However, "[g]reat clarity is necessary to contract away the at-will presumption." *Schoch*, 912 F.2d at 660 (citation omitted). "The modification of an at-will relationship to one that can never be severed without just cause is such a substantial modification that a very clear statement of an intention to so modify is required." *Id.* The burden is so great that "only clear evidence that the parties intended to contract for a definite period will set aside the presumption." *Id.* Plaintiff fails to provide such clear evidence here.

Plaintiff asserts that "[o]n or about October 29, 2018, Defendants Levetated *and* Prime told Plaintiff there was a lot of work for him in the U.S. Virgin Islands . . . . and that if he moved to St. Croix and agreed to the terms of the job of Quality Assurance House Inspector as delineated by Defendants, then Plaintiff would be gainfully employed in the V.I. for a long time and be offered work in other locations when Defendant Prime moved to participate in other disaster recovery programs." (ECF No. 17 ¶16.) According to Plaintiff, "Defendants represented" to him that if he worked hard "he would have employment with Defendant for many years."(ECF No. 17 ¶64.) Plaintiff claims that he "relied on those representations and left his abode on [*sic*] the States and moved to St. Croix." (ECF No. 17 ¶ 65.)

Levetated denies that it made any guarantees of future work to Plaintiff, (ECF No. 413 at 18, n.11), and points out that Plaintiff executed his at-will agreement in writing *after* his

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 19 of 44

conversations with Levetated's recruiter. *Id.* at 18. According to the record, Plaintiff spoke exclusively with Embry of Levetated before flying to St. Croix, and Plaintiff signed an at-will employment waiver *before* flying to St. Croix. He provides no evidence that the parties reached an agreement to modify the at-will employment arrangement to one that could only be terminated for cause. Furthermore, the only details Plaintiff provides as to alleged promises made by Prime or WOB sprout from conversations that occurred *after* he had already made the decision to "leave his abode" to work in St. Croix and was already in the Virgin Islands working.[25] Although Plaintiff contends that these conversations suffice as modifications to overcome the at-will presumption, Defendants contend that no modification of Plaintiff's at-will status occurred. *Id.*

"[A]n employment relationship is at-will unless it is modified by a statute, such as the WDA, or an express contract provision." *Canton*, 2017 V.I. LEXIS 116, at *16. As a bi-lateral binding agreement, "modification requires all the elements of a contract, specifically mutual assent, and consideration." *Ryan Int'l Airlines, Inc. v. Link Invs., LLC*, Civil Action No. 04-0308, 2007 U.S. Dist. LEXIS 107722, at *10 (D.N.J. Oct. 31, 2007) (citations omitted). "Proof of an enforceable contract or contract provision requires a showing that both parties manifested an intent to be bound by the terms of the agreement; terms which are sufficiently definite to be specifically enforced; and a mutuality of consideration." *Mucci v. Home Depot*, CIVIL ACTION No. 00-4946, 2001 U.S. Dist. LEXIS 20815, at *8 (E.D. Pa. Dec. 18, 2001) (citing *Channel Home Centers v. Grossman*, 795 F.2d 291, 298-99 (3d Cir. 1986); *Agueda v. Marcano*, 2024 V.I. Supreme LEXIS 22, at *14 (May 10, 2024) ("In addition to offer, acceptance, and

---

[25] Plaintiff asserts that after he signed the Applicant Waiver and was on the job in St. Croix, Prime's CEO, Hilario, promised Plaintiff he would be offered continued employment by Levetated and Prime, if he did a good job. (ECF No. 373 at 14.) According to Plaintiff, sometime in "January [2019], plus or minus a month,"

> [Hilario] spoke to the whole group at large. And basically, he wanted to express, you know, gratitude and appreciated what we were doing in St. Croix. And he alluded to having other jobs, other opportunities if you do a good job on this one. And the reason I remember that so plainly is because I took the opportunity to go shake his hand after that announcement to the group because I wanted him to associate my face with my name 'cause it could potentially concern future employment, and I wanted him to know who I was; that's all. I just shook his hand, introduced myself, and I was the only one in the group that did that. So, he should have remembered that.

(ECF 347-2 at 2, Pl.'s Dep.)

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 20 of 44

consideration, a valid contract requires that the parties assent to the same terms; that is, that they have a meeting of the minds."). It is clear that mutual assent—the meeting of the minds—is missing here, but also missing is consideration.

### 4. *No evidence of consideration*

An oral modification of a written agreement is unenforceable in the absence of consideration. *Mucci*, 2001 U.S. Dist. LEXIS 20815, at *1; *see also In re H & G Distrib.*, 158 B.R. 959, 962 (E.D. Pa. 1993) ("[A] written agreement can be modified by a subsequent oral agreement provided the latter is based upon valid consideration and is proved by evidence that is clear, precise and convincing.").

"Consideration is an act, forbearance, or return promise bargained for and given in exchange for the original promise." *Mucci*, at *1; *see also Scott v. Extracorporeal Inc.,* 545 A.2d 334, 335 (1988) ("A court will find 'additional consideration' to bring an employment contract out of the at-will presumption when an employee affords his employer a substantial benefit other than the services which the employee is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform. If the circumstances are such that a termination of the relation by one party will result in great hardship or loss to the other, as they must have known it would when they made the contract, this is a factor of great weight in inducing a holding that the parties agreed upon a specific period."); *Brunner v. Abex Corp.*, 661 F. Supp. 1351, 1356 (D.N.J. 1986) ("[A] long-term employment commitment is only enforceable if there is clear and convincing proof of a precise agreement, and the long-term commitment is supported by consideration from the employee in addition to the employee's continued work." ); *Marsh v. Boyle*, 366 Pa. Super. 1, 3, 530 A.2d 491, 492 (1987) (finding Appellee's assurances of work for at least two years did not overcome the at-will presumption, but finding "the presumption could be rebutted by the additional consideration of appellant's resignation [from his previous job], attempt to sell his house, and relocation and the circumstances surrounding the agreement."). Black's Law Dictionary defines consideration as "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee; that which motivates a person to do something, esp. to engage in a legal act." Black's Law Dictionary

(12th ed. 2024). Glaringly, Plaintiff does not even allege that he provided consideration.[26] He did pick up and move a lengthy distance to a location that he had never been before, but Plaintiff stated that he responded to Levetated's advertisement for work in the Virgin Islands because "[w]ork had gotten really slow on the mainland" and he was "open to other alternatives." (ECF No. 341-2 at 9, Pl. Dep.) Plaintiff implicitly denies that he voluntarily decided to relocate to the Virgin Islands, a place he had never visited before, but he offers no factual support to back up this allegation.

The Court must examine factors surrounding a hiring to determine whether a reasonable person in the employee's situation would understand that his employment status is at will. The record is void of a contract provision or clear statement of intent, whether written or oral, creating a duty to terminate Plaintiff only for just cause or with due process protections. *See Canton,* 2017 V.I. LEXIS 116, at *16. Plaintiff's employment relationship with Defendants was governed by the employment-at-will doctrine, and Plaintiff's status was not affected by the WDA or any public policy exception. Plaintiff fails to provide any "express contract provision" demonstrating a modification or any additional consideration. And Plaintiff fails to demonstrate evidence of consideration.

Plaintiff concedes that he signed a document acknowledging that he was employed on an at-will basis and relies only on his own assertions to argue otherwise. "In the normal at-will employment relationship it is self-evident that an employer has only a minimal duty of care to his employees," and "oral assurances regarding job security will not be sufficient to create an implied promise or contract." *Brunner v. Abex Corp.*, 661 F. Supp. 1351, 1357 (D.N.J. 1986) (finding that Plaintiff's decision to move to New Jersey for a job as an at-will employee was freely made). The Third Circuit has held as "too vague to supplant the at-will presumption" where an employee was hired to work on '*long-term* government projects,'" or where an employer represented to an employee that he "would be promoted to superintendent and perhaps more." *Schoch*, 912 F.2d at 660 (citing Pennsylvania cases).

---

[26] In alleging harm, Plaintiff focuses on loss from properties that he had invested in *after* accepting employment. (*See* ECF No. 17 ¶55; ECF No. 379 at 14.)

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 22 of 44

What the record clearly shows in writing is that Plaintiff agreed to employment with Levetated as an at-will employee when he signed the applicant waiver, (ECF No. 347-1), and he again acknowledged his status when he signed Prime's employee handbook. While the Court empathizes with Plaintiff, the Court is bound by law and finds Plaintiff fails to overcome the presumption of an at-will employment arrangement in the instant matter. Even considering all evidence in the light most favorable to Plaintiff, there is no triable issue of fact as to his status as an at-will employee that could be terminated "at any time for any or even no reason." The Court now considers the sufficiency of each cause of action.

### B. Defendants are entitled to summary judgement on Plaintiff's fraudulent misrepresentation claim.

Plaintiff alleges that Embry of Levetated and Hilario of Prime made fraudulent misrepresentations that he relied upon when making the decision to leave "his abode" and "gainful employment and income" in the U.S. mainland, and to move to the Virgin Islands where he "began investing in real estate and making St. Croix his home."[27] (ECF No. 17 ¶¶65-

---

[27] In his First Amended Complaint, Plaintiff asserts that he left "gainful employment and income" to move to St. Croix, but when deposed by counsel for Levetated, Plaintiff's answers do not support his assertion.

Q: And why did you decide to get involved
with the response effort?
A: Work had gotten really slow on the
Mainland with Rich Custom Homes, and I was open to
other alternatives.
(ECF No. 449-1 at 12.)

Q: How were you employed on October 11th,
2018?
A: I would have been building houses as Rich
Custom Homes or remodeling.
Q: You recall if you had any projects going
on that day?
A: No. Probably not. That's why I was
looking elsewhere.
Q: Okay. You don't believe you had any
income-producing employment at that time?
PLAINTIFF'S COUNSEL: You mean at that instant?
Q: On that day, yes, October 11th, 2018.
A: True.
Q: What about between October 11, 2018, and
the time that you ultimately did travel to
St. Croix, did you have any income-producing
employment during that space of time through

66.) Plaintiff claims Embry and Hilario "knew or should have known those representations were not truthful," and as a result, Plaintiff suffered damages. *Id.* ¶¶ 67-68.

As a preliminary matter, the Court first addresses whether Georgia law or U.S Virgin Islands law applies to the instant claim.

### 1. Conflict-of-Law

Levetated argues that Georgia law governs the claim at issue under Virgin Islands Choice of Law principles because "Levetated's representations related to [Plaintiff's] employment were received . . . and relied upon by him in Georgia."[28] (ECF No. 340 at 3.) Plaintiff, on the other hand, argues that Levetated waived any right to raise a conflict-of-law issue by not having raised it earlier in its Answer to Plaintiff's First Amended Complaint or in its Motion to Dismiss. (*See* ECF Nos. 170 and 18, respectively.) Levetated counters that it did not have a basis to raise the issue until after Plaintiff's deposition was taken in 2024 "when he confirmed that he was in Georgia when the alleged misrepresentations were made to him." (ECF Nos. 341 ¶4 and 341-3 at 3, 4). Levetated contends that it could not have raised the issue any earlier.

A waiver is the "intentional relinquishment or abandonment of a known right." *Morgan v. Sundance, Inc.,* 596 U.S. 411, 417 (2022) (citation omitted). Indeed, a defendant must raise choice of law issues, or they will be waived—and "it is the parties' responsibility to call a choice of law issue to the court's attention." *Neely v. Club Med Mgmt. Servs.*, 63 F.3d 166, 180 n.10 (3d Cir. 1995).

Plaintiff cites to *Neely* for the premise that conflict-of-law issues may be waived but provides nothing to show why Levetated has waived its right. The court in *Neely* noted that

---

Rich Custom Homes?
A: I don't recall.
*Id.* at 30.

[28] Levetated cites to Restatement (Second) of Conflict of Laws § 148 and *St. Croix Renaissance Grp. v. St. Croix Alumina*, Civil Action No. 04-067, 2009 U.S. Dist. LEXIS 120525, at *30-31 (D.V.I. Dec. 23, 2009) ("For fraud and misrepresentation claims, the Virgin Islands applies § 148 of the Restatement (Second) of Conflict of Laws. Under § 148(1), it will apply the law of the state where: the false representations were made and received, . . . unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties."). (*See* ECF No. 340 at 3.)

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 24 of 44

"[i]f plaintiff bases his claim on inapplicable law, i.e., a law that does not give plaintiff a right to relief, the defendant must notify the court in a motion to dismiss *or a motion for directed verdict*." *Id.* at 170 (emphasis added). Because a motion for directed verdict is often submitted late in the game, so to speak—after a party rests its case—the Court finds no reason to disallow raising it here in Levetated's motion for summary judgment. Plaintiff presents no authority propounding otherwise. Accordingly, the Court finds the choice-of-law-issue is not waived.

In an action of diversity of citizenship jurisdiction, Federal courts must follow conflict of laws rules prevailing in the states in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941); *accord Yohannon v. Keene*, 924 F.2d 1255, 1265 (3d Cir. 1991).[29] The Court looks to choice of law rules of the U.S. Virgin Islands; however, the Court first considers whether a true conflict exists. "According to conflicts of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question." *Berg Chilling Sys. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006); *accord Williams v. Stone*, 109 F.3d 890, 891 (3d Cir. 1997).

The requisite elements for a fraudulent misrepresentation claim under Georgia and U.S. Virgin Islands law are strikingly similar. Under Georgia law, to prove fraud a plaintiff must show:

> (1) a false representation by the defendant; (2) scienter; (3) an intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff.

*Lakeview Loan Servicing, LLC v. Mobley*, 2019 U.S. Dist. LEXIS 135550, *8 (N.D. Ga. June 4, 2019) (citations omitted). To prevail on a claim for fraudulent misrepresentation under Virgin Islands law, a plaintiff must show:

> (1) the defendant misrepresented a material fact, opinion, intention, or law; (2) that it knew or had reason to believe was false; (3) and was made for the purpose of inducing the plaintiff to act or refrain from acting; (4) which the plaintiff justifiably relied on; and (5) which caused the plaintiff a pecuniary

---

[29] "Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage.'" *Berg Chilling Sys*, 435 F.3d at 462.

loss. The misrepresentation element for fraudulent misrepresentation may be satisfied by false information communicated directly or indirectly by the nondisclosure of material facts.

*Love Peace v. Banco Popular de P.R.*, 75 V.I. 284, 285 (2021).

Here, the law of both jurisdictions would produce the same result. Because the Court finds that its decision would be the same regardless of which law is applied, the Court need not decide the choice-of-law question and proceeds to its analysis on the merits.

### 2. No material dispute as to whether Defendants falsely misrepresented any material fact of opinion, intention, or law—or knew or had reason to believe statements made to Plaintiff were false

"A party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In his First Amended Complaint, Plaintiff identified Levetated *and* Prime as the makers of specific and allegedly false statements spoken to him on October 29, 2018, on which he allegedly relied when he relocated to St. Croix to commence working on November 1, 2018. (ECF No. 17 ¶¶16,17.) Then, in his opposition to Levetated's motion for summary judgment, Plaintiff asserted that "on or about" October 29, 2018, only Embry of Levetated told him that there would be "a lot of work for him in the U.S. Virgin Islands" and that "if he moved to St. Croix and agreed to the terms of the job of Quality Assurance House Inspector. . . [he] would be gainfully employed in the V.I. for a long time." (ECF No. 373 at 7, 8.) Plaintiff further states that it was not until "later, while on the job" working for Levetated and Prime in St. Croix that Prime's CEO, Hilario, promised future work beyond the three-month assignment "if [Plaintiff] did a good job." *Id*. at 7. Plaintiff asserts that he relied on "assurances of future work" through conversations with Embry before taking the job and from Hilario *after* taking the job. *Id.*

### a. No dispute of material fact as to false representations by Levetated

Fraud arises "from a knowing or reckless misrepresentation or concealment of material fact made to induce another to act to his or her detriment." Black's Law Dictionary (12th ed. 2024). The record is void of any evidence of specific fraudulent representations made for the purpose of inducing Plaintiff to move. As addressed above, verbal assurances of future employment do not overcome the at-will presumption. Plaintiff fails to demonstrate

that his alleged reliance was justifiable. As an at-will employee, Plaintiff does not have a reasonable expectation of continued employment or just cause termination. *See Clark v. V.I. Hous. Auth. (VIHA),* 75 V.I. 180, 187-88 (Super. Ct. 2021) (citing *Canton*, 2017 V.I. LEXIS 116, at *24 (clarifying the scope of the implied duty of good faith and fair dealing that exists in at-will employment contracts). As an at-will employee, Plaintiff could be terminated for any reason or none at all.

Furthermore, Plaintiff signed the Applicant Waiver acknowledging his at will status *after* the alleged assurances by Embry.[30] The allegation of fraudulent misrepresentation does not survive Plaintiff's acknowledgment of his at-will status or the legal principle that assurances of future work do not overcome the presumption of at-will employment. Moreover, Plaintiff fails to demonstrate that Levetated had the requisite scienter or had reason to believe statements made to Plaintiff were false.

As for pecuniary loss, "[a] defendant's fraudulent misrepresentation must be the cause-in-fact and the proximate cause of the plaintiff's pecuniary loss." *Love Peace*, 75 V.I. at 285. As mentioned earlier, Plaintiff stated that that he responded to Levetated's advertisement for work in the Virgin Islands because "[w]ork had gotten really slow on the mainland" and he was "open to other alternatives."[31] Plaintiff asserts that he suffered

---

[30] The Court also notes that Plaintiff challenges application of Statute of Frauds on the basis of having an "at-will agreement":

> "[t]he Virgin Islands Supreme Court in *Yusuf v. Hamed,* held that the Statute of Frauds is not implicated for an "indefinite at-will agreement" based on well-settled law in the Virgin Islands that the statute of frauds has no application to oral contracts that, while intended to last for more than a year, have no stated durational terms and *could* conclude within a year. *Yusuf v. Hamed*, 59 V.I. 841, 852–53,2013 WL 5429498, at *5 (V.I., 2013) (citing *Peppertree Terrace v. Williams,* 52 V.I. 225, 232 n.5 (V.I.2009)("'It is well settled that the oral contracts invalidated by the [s]tatute [of frauds] because they are not to be performed within a year include only those which *cannot* be performed within that period.'"(quoting 9 RICHARD A. LORD, WILLISTON ON CONTRACTS § 24–3 (4th ed. 1999))).

(ECF No. 373 at 12, 13.)

[31] *Compare, e.g***.** *Mosler v. Gerace*, 78 V.I. 649 (2024) (finding intentional misrepresentation where the unfulfilled "promise of a seven-year lease [induced] Plaintiffs to act" where evidence demonstrated that Plaintiffs were eager to get a lease on the property that their restaurant was located on and Defendants knew that Plaintiffs would act in order to get the lease because Plaintiffs bought the restaurant for $50,000, Plaintiffs had lost money they invested "to fix and improve the restaurant," and Plaintiffs wanted to remain in the facility to get a return on their investment). In *Mosler*, Plaintiffs were promised a long-term lease if they completed certain

pecuniary losses from real estate properties that he was buying and selling in the Virgin Islands at the time of his termination. (ECF No. 17 ¶57.) However, Plaintiff—as an at-will employee—fails to demonstrate how these losses were proximately caused by any misrepresentation. His alleged damages—of property investments gone bad—are too removed from Plaintiff's decision to move to St. Croix three months earlier—even if based on the belief that his initial three-month contract would be extended.

Although it is unfortunate that Plaintiff's dispute with Shows escalated to the point that both were removed from their assignment, Plaintiff could be removed for any reason at all—or for no reason. Here, as an at-will employee, the fallout from his unfortunate altercation with a coworker was his removal from the assignment. Plaintiff fails to adequately connect his alleged real property losses or any other alleged damages to his claim of false representations by either Levetated or Prime, or to Plaintiff's job termination. For all of the reasons discussed above, the Court finds no genuine dispute of fact exists as to whether fraudulent misrepresentations of future work with the purpose to induce were made by Levetated.

### b. *No dispute of material fact as to false representations by Prime*

Plaintiff also fails to establish that Prime knew or had reason to know statements made to Plaintiff were false. Prime contends that "any statements that there was a lot of work to do in the U.S. Virgin Islands, and that anyone performing good work could expect to remain employed, were not false." (ECF No. 344 at 6.) However, Plaintiff's argument falls flat largely because he cannot reasonably allege that he was induced to accept a job in St. Croix by representations made *after* he had already accepted the job and had already moved to St. Croix. An inducement is "[t]he act or process of enticing or persuading another person to take a certain course of action." Black's Law Dictionary (12th ed. 2024). Plaintiff had already

---

improvements and repairs to the property, which they did. Plaintiffs provided evidence demonstrating that despite their requests for a seven-year long lease, it was never given to them. Plaintiffs also showed that when another potential tenant appeared, Defendants gave him a lease for seven years—despite explicitly agreeing to give Plaintiffs a seven-year lease if they completed the contemplated improvements and repairs which were, initially, replacing screens and sinks, painting the outside of the restaurant, resurfacing the bar and doing a general cleanup; and subsequently, fixing the damages to the kitchen and restaurant caused by an incorrectly-sized ventilation hood over the kitchen stove.

taken the action he claims Prime was purposely inducing him to take. Plaintiff accepted the position with Levetated in late October 2019 and Plaintiff concedes that Hilario's alleged assurances were made in January, after Plaintiff was already on the job. (ECF No. 449-1 at 14.) Hilario could not induce Plaintiff to pick up and move to St. Croix with promises of future work when Plaintiff was already working in St. Croix. Accordingly, the Court finds no genuine dispute as to whether fraudulent misrepresentations of future work with the purpose to induce were made by Prime.[32]

### c. *No dispute of material fact as to non-disclosure*

Plaintiff further argues that Defendants Levetated and Prime made a deliberate non-disclosure of material fact, alleging that "Levetated and Prime deliberately did not disclose that Witt O'Brien could unilaterally terminate Plaintiff even if he did a good job." (ECF No. 373 at 6.) Conclusory allegations cannot overcome summary judgement. Plaintiff spends a great portion of his argument alleging that all Defendants were "co-employers," but even if this were accurate, Plaintiff was hired as an at-will employee and nothing on the record demonstrates that he could not be terminated by Levetated at any time with or without cause—regardless of whether WOB wanted him fired or not. Plaintiff fails to demonstrate the existence of any "hoax," as asserted. (*See* No. ECF 373 at 12.)

"Upon a motion for summary judgment, the nonmoving party must make a showing sufficient to establish the existence of every element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin v. Bora Corp.*, 96 F.3d 66, 68 (3d Cir. 1996); *Celotex,* 477 U.S. at 319 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). Plaintiff fails to establish the essential elements of his claim, including whether Prime or Levetated's statements made before or after his employment began were fraudulent or false. Plaintiff's signed Applicant Waiver demonstrates that his employment was entirely at will. Nothing on the record demonstrates a knowing misrepresentation of truth or concealment of material fact by Prime or Levetated that induced Plaintiff to accept a job with Levetated in

---

[32] As mentioned earlier, although Plaintiff asserted that WOB made false representations in his First Amended Complaint, Plaintiff did not provide specific facts to support the allegation, nor did he raise the allegation again in subsequent briefings.

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 29 of 44

St. Croix or to buy real estate in St. Croix. Plaintiff fails to establish that his pecuniary losses or damages were proximately caused by intentional misrepresentations. As an at-will employee Plaintiff is not due lost wages or damages in the form of failed real estate investments merely because he was discharged. Accordingly, the Court finds no dispute over any material fact as to Plaintiff's fraudulent misrepresentation claim and finds for summary judgment in Defendants' favor.

### C. Defendants are entitled to summary judgment on Plaintiff's negligent retention claim.

Plaintiff asserts that he was owed the duty of a safe workplace, and that Defendants breached that duty in their handling of workplace violence. The basis for Plaintiff's claim is the negligent retention of Shows. Negligent retention occurs when an employer continues to employ a worker despite knowing that the person poses a risk to others. To prevail on a claim for negligent retention, Plaintiff must establish the following elements:

> (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing plaintiffs injuries; and (5) the employer's negligence in hiring or retaining the employee was the proximate cause of the plaintiff's injuries.

*Canton v. Gov't of the V.I.*, No. SX-13-CV-42, 2016 V.I. LEXIS 31, at *5 (V.I. Super. Apr. 4, 2016) (citing *Bell v. Radcliffe*, No. ST-13-CV-392, 2014 V.I. LEXIS 119, *31-33 (V.I. Super Ct. 2014); *see also Rich v. Witt O'Brien's, LLC*, No. 1:19-cv-0022, 2023 U.S. Dist. LEXIS 179856, at *19 (D.V.I. Oct. 5, 2023). Each element must be analyzed in a light most favorable to Plaintiff, however, "[u]nsupported allegations are not sufficient when faced with a motion for summary judgment." *Mincy v. Chmielsewski*, 508 F. App'x 99, 104 (3d Cir. 2013).[33] In substance, Plaintiff alleges that Defendants were negligent. The foundational elements of a negligence cause of action, which Plaintiff must demonstrate are:

---

[33] Plaintiff generally argues that Shows demonstrates a propensity for violence because of the text messages he sent the evening of January 25, 2019. In his First Amended Complaint, Plaintiff alleged that Shows "started sending numerous threatening emails and leaving numerous threatening voice mails asking Plaintiff where he was so Shows could find him to beat him up." (ECF No. 17 ¶ 37.) However, the only evidence on record of threats presented are the personal text messages sent between 6 and 10 p.m. on January 25, 2019. (*See* ECF No. 449-8.)

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 30 of 44

(1) a legal duty of care to the plaintiff; (2) a defendant's breach of that duty of care; (3) factual and legal [often referred to as proximate] causation; and (4) damages.

*Miller v. V.I. Wheel Estate, LLC*, 75 V.I. 331, 332 (2021) (citing *Aubain v. Kazi Foods of V.I., Inc.*, 70 V.I. 943, 948-49 (V.I. 2019).

 "If a party acts unreasonably by failing to protect against an event that a reasonably prudent person would protect against, then that negligent actor may be liable for simple negligence." *Figgs*, 652 A.2d at 1092 (internal citations omitted); *accord Osborne v. PSMT, LLC*, No. ST-16-CV-24, 2017 V.I. LEXIS 15, at *6 (Super. Ct. Jan. 19, 2017) ("With respect to duty under an ordinary negligence analysis, a defendant owes a duty to exercise reasonable care to protect against foreseeable harm.") (citing *Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 380, 383 (2014).

Plaintiff argues that Shows should have been terminated as an employee after Plaintiff showed Valadez the texts Shows sent him.[34] (ECF No. 17 at ¶83.) In opposition, Defendants argue that any alleged wrongful termination of Plaintiff must fail because Plaintiff was an at-will employee. Defendants also argue that Plaintiff has not produced any evidence demonstrating Shows had a reputation for alleged propensity of violence. Defendants contend that Plaintiff's claims for negligent retention must fail because Plaintiff has set forth no facts to show that Defendants knew or should have known of Shows' alleged propensity for violence, or that it was foreseeable that Shows would exhibit violent conduct, and Shows was nevertheless retained.

Plaintiff maintains that despite Defendants' assertions to the contrary, he has alleged specific facts regarding his claims for negligent retention in that Defendants were aware that Shows sent Plaintiff threatening text messages. The Court addresses each element of Plaintiff's claim.

### 1. Existence of an employment relationship

---

[34] Valadez, on behalf of Prime, among others on behalf of Prime, supervised Plaintiff while he was working on the Prime project in St. Croix. (ECF 342-3 at 18.)

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 31 of 44

Plaintiff asserts that all three Defendants were "co-employers" of Shows. Defendants challenge this notion.[35]  Notwithstanding, the parties do not dispute that this first element is met—at the very least—by the employment relationship between Shows and Levetated. Issues concerning whether Shows was an employee of Prime and/or WOB are highly fact intensive, and the Court finds there are material facts of dispute that would preclude summary judgment on this element.

### 2. *Employee incompetence*

Incompetence is defined as "the quality, state, or condition of being unable or unqualified to do something." Black's Law Dictionary (12th ed. 2024). On the basis of personal texts sent to Plaintiff during off duty hours on January 25, 2019, Plaintiff argues that Shows demonstrated "aggressive and potentially violent propensities" to suffice as a showing of incompetence. (ECF No. 375 at 9.) The Court disagrees.

A "propensity" is defined as "a natural tendency to behave in a particular way; especially the fact that a person is prone to a specific type of bad behavior." Black's Law Dictionary (12th ed. 2024). Propensity evidence is "[e]vidence that shows a tendency to behave in a certain way; especially in criminal law, evidence of a particular type *of prior* bad act or a *prior conviction* offered to show that a person is likely to engage in that behavior again." *Id.* (Emphasis added.) Propensity is explained as a natural inclination or an innate or inherent tendency. These definitions suggest that a single incident that occurred within an hour of the cause of action is deficient for demonstrating a "propensity," but that patterns—especially escalating patterns—do present such a red flag. Here, the inquiry pertains to Shows' conduct prior to January 26, 2019, and whether it was of such nature as to indicate a propensity for violence.

The alleged "red flag" here flows from a text exchange between Shows and Plaintiff during off duty hours on January 25, 2019:

---

[35] "Prime screened the experience, licensing and certification of Plaintiff as Quality Assurance Inspector for hire by co-defendant Levetated to work in the U.S. Virgin Islands to inspect the work done on home repairs under the FEMA STEP program." (ECF No. 342-3 at 13, Prime Resp. to Interrog. No. 4.); "Shows signed employment documents with Levetated, including some provided by Prime, under which he was to work for Prime on a project overseen by WOB." (ECF No. 336 at 6, 7.)

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 32 of 44

PLAINTIFF:    Time to pay up the 100 Hugh. Thank you sir. Good
              thing I talked you out of the 500 bet! (6:09 p.m.)

SHOWS:        Dude what the fuck did I tell you??? (6:25 p.m.)
              I'm gonna fuck you up tomorrow morning
              I'm gonna smash you [*sic*] fucking jaw you fuck!!! (6:26 p.m.)
              You must've thought I was joking.... I wasn't!!! (6:27 p.m.)
              Matter of fact where the fuck are you right now (6:29 p.m.)
              What....now you don't wanna talk??? (6:41 p.m.)
              You fucking pussy!!!! I'ma get you. (8:09 p.m.)
              I'm coming for you you dumb fuck!!!!! (9:39 p.m.)
              Answer the phone you fucking pussy
              You fucking pussy
              I'll see you in the morning bitch..... Hope your ready for me
              Pussy ass bitch !!! (9:43 p.m.)
              You fucked with the wrong one......I told you not to, but no........now
              you've got it coming!!!!!! (9:44 p.m.)
              Fucking coward!!!!!!!!
              See ya in a little while you fuck!!!!! (10:29 p.m.)

(ECF No. 449-8.)

Distasteful as it is, this single text exchange is the only evidence on record to support a propensity for violence. In *all* the cases Plaintiff cites for support, incompetence is demonstrated by *multiple* reports of prior inappropriate and recurring behaviors that take place before any injurious encounter that is the subject of the action.[36] Plaintiff's single report of Shows' texts to Valadez and the altercation itself both occurred on the same morning before 7:12 a.m. within an hour's time frame. (ECF No. 449-1 at 3 and ECF No. 17 ¶ 39.) Plaintiff provides no authority suggesting that a single report under similar

---

[36] *See, e.g. Chase v. Virgin Islands Port Authority*, 3 F. Supp.2d 641, 642 (D.V.I. 1998) (finding that on numerous occasions before the alleged assault, the employee "had acted in such a hostile manner as to put VIPA on notice of his potential to create an unreasonable risk of bodily harm to others"); *Curry v. Koch Foods, Inc.*, No. 2:16-CV-02008-SGC, 2019 U.S. Dist. LEXIS 45477 (N.D. Ala. Mar. 20, 2019) (evidence included *multiple* prior reports of sexual harassment incidents related to Title VII liability harassment); *Macias v. Sw. Cheese Co., LLC*, 624 F. App'x 628 (10th Cir. 2015) (evidence included *multiple* reported incidents of employee's inappropriate behavior); *but see Vicuna v. Empire Today, LLC (a Northlake, Ill.-based Co.)*, 2015 NY Slip Op 04403, 1, 128 A.D.3d 578, 578, 10 N.Y.S.3d 52, 53 (App. Div. 1st Dept.) (affirming summary judgment in dismissing a negligent hiring and retention claim where a warehouse operator had no notice that its employee, who allegedly struck a carpet installer in the face, had a propensity to engage in violent behavior; the employee's personnel file contained reports of employer admonishments for being short-tempered and verbally inappropriate in dealing with coworkers on several occasions, however it did not contain any reports of physically violent behavior or verbal threats made, much less that he had a propensity to do so).

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 33 of 44

circumstances serves to render an employee—with no prior record of violent behavior—incompetent.[37] While Plaintiff has alleged that Shows possessed a propensity for violence, the allegation is not supported with evidence. Here, the record prior to January 26, 2019, is void of *any* evidence of such a nature as to indicate a propensity for violence.

Plaintiff alleges that the record demonstrates Shows "had an extensive criminal background," and proffers Shows' previous encounters with the law—including arrests. However, "information concerning a prospective employee's record of arrests without convictions, *is irrelevant to his suitability or qualification for employment.*" *Delorenzo v. HP Enter. Servs., LLC*, 207 F. Supp. 3d 26, 55 (D.D.C. 2016) (emphasis in original). Moreover, those encounters occurred fifteen years prior and in contexts different from the issue at hand.[38] (ECF No. 375 at 8, 9 and ECF No. 449-3 at 12, 13.) Plaintiff further states that Shows had "been in a couple fights." And Shows does admit to three fights in his life, but these fights took place twenty years prior—when he was in junior high school. (ECF No. ECF 449-3 at 13, Shows Dep.) Plaintiff further proffers that "Shows admitted that he was going through a divorce while in St. Croix working and he was edgy." (ECF No. 375 at 8, 9.) This, likewise, does not suffice to demonstrate a propensity for violence.

Before hiring Shows, Levetated hired "a third-party vendor to generate a background screening report"—which included a national criminal database search—and it contained no information indicating a violent disposition or that Shows was unfit for employment. (ECF

---

[37] The Court acknowledges that in its Memorandum Opinion responding to Defendants' motions to dismiss filed during the pleading stage of this matter, it arrived at a different conclusion. (ECF No. 143; *Rich v. Witt O'Brien's, LLC*, No. 1:19-cv-0022, 2023 U.S. Dist. LEXIS 179856 (D.V.I. Oct. 5, 2023)) The Plaintiff's burden was different then. The Third Circuit has noted the U.S. Supreme Court's explanation for the different burdens placed on the plaintiff in satisfying the standing requirement at the motion to dismiss stage as compared to the motion for summary judgment stage. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279 (3d Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations omitted).

[38] Plaintiff states that Shows had been "arrested for theft, disturbing the peace, DUI, violating a protective order and failure to pay child support prior to being hired by Levetated and Prime." (ECF No. 375 at 9.)

No. 340 at 19.) Furthermore, the record holds no evidence demonstrating that Shows lacked the ability, knowledge, legal qualification, or fitness to perform his work duties as a QA Inspector, or that anything had transpired during the course of his assignment prior to January 26, 2019, to suggest he had a violent disposition or that he was unfit for employment.

The Court does not minimize the highly inappropriate and threatening nature of the text messages; however, the only plausible evidence on record proffered to demonstrate that Shows was incompetent is the single report to Valadez of these personal text messages sent on January 25, 2019. Plaintiff provides no other plausible evidence to demonstrate incompetence or a propensity for violence by Shows prior to this.

"Where a plaintiff alleges that an employee has a propensity for violence, it is not sufficient that the plaintiff proves a mere possibility of violence. Rather, there must be proof that the employee is a person of known vicious character or one whom the employer should know had a vicious character." *Thatcher v. Brennan*, 657 F. Supp. 6, 7 (S.D. Miss. 1986). Moreover, timing is critically important in the analysis of a negligent retention claim. Shows' incompetence had to be evident *before* the altercation at work took place on January 26, 2019. *Westberry v. State Operated Sch. Dist.*, No. 15-07998 (JMV), 2017 U.S. Dist. LEXIS 76432, at *31 n.11 (D.N.J. May 19, 2017) ("The employee's incompetence, unfitness, or dangerous attribute must be known to the employer *before* the employee takes the action which causes a plaintiff's injury.") (emphasis in original). Plaintiff cannot point to the conduct that allegedly caused him injury as proof that Defendants "knew or should have known of the dangerous or harmful proclivity of the employee." *Id.*; *accord Moretz v. Trs. of Princeton*, Civil Action No. 21-19822 (GC) (TJB), 2023 U.S. Dist. LEXIS 230763, at *7 (D.N.J. Dec. 29, 2023); *see also Bell*, 2014 V.I. LEXIS 119, at *32-34 n.27 ("Negligent retention occurs when, *during the course of employment*, the employer becomes aware or should have become aware of problems with an employee that indicated his [or her] unfitness, and the employer fails to take further action such as investigating, discharge or reassignment.") (emphasis added) (citation omitted).

The Court finds that there is insufficient evidence on this record that would create a genuine dispute of material fact that Shows possessed a particular incompetence, unfitness,

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 35 of 44

or dangerous attribute prior to the incident that occurred between Shows and Plaintiff on January 26, 2019. The one-time isolated behavior of sending threatening texts on an evening during off duty hours fails to establish the employee incompetence required for a successful negligent retention claim. Because Plaintiff must satisfy all five elements of the cause of action, the Court's analysis could end here. However, the Court addresses the remaining elements.

### 3. *Defendants' actual or constructive knowledge of incompetence*

To fasten liability upon the employer, it must be shown that the employer knew or, in the exercise of ordinary care, should have known that the employee has dangerous propensities that might cause harm to another party. *See Hutchison by Hutchison v. Luddy*, 742 A.2d 1052, 1057-58 (1999) (citing *Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 246 A.2d 418 (1968) (holding employer not liable where employee's act of "horseplay" while on the job did not suggest a propensity for violence)); *but see Coath v. Jones*, 277 Pa. Super. 479, 419 A.2d 1249 (Pa. Super. Ct. 1980) (holding employer liable where employer should have known of employee's inclination to assault women). "A plaintiff must show that an employer, knowing or on notice of an applicant's propensity for misconduct, nevertheless negligently declined to terminate the employee after learning of a dangerous tendency."[39] *Fusco v. Uber Techs., Inc.*, No. 17-00036, 2018 U.S. Dist. LEXIS 126428, at \*11 (E.D. Pa. July 27, 2018). An employer may be negligent for the failure to exercise reasonable care in determining an employee's propensity for violence. *See Burns v. Seaworld Parks & Ent., LLC.*, 675 F. Supp. 3d

---

[39] See also *James-Frederick v. Frenchman's Reef & Morning Star Marriott Beach Resort*, No. 12-80 (SDW), 2013 U.S. Dist. LEXIS 108488, at \*4 (D.V.I. Aug. 1, 2013). The plaintiff in *James-Frederick*, alleged that she had been threatened in person by a co-worker while on the job. Plaintiff alleged that the co-worker "waved his hand in her face and said, 'that he would "meet me" (sic), which plaintiff interpreted as a threat within and outside of the workplace.'" *Id.* at \*4. Plaintiff's supervisor sent the co-worker home for the day pending further investigation into the matter, but later permitted the coworker to return to the premises because his skill set was needed. Although no other incident between the two occurred, Plaintiff complained that she felt unsafe and resigned from her position. She then filed a negligent retention claim asserting that her employers knew about the co-worker's threats, failed to take adequate action or warn employees of his conduct, and the retention of his "unfitness or dangerous characteristics" caused her injuries. The Court found the plaintiff's claim "factually insufficient." *Id.* at \*24. The Court stated "Plaintiff provides vague and conclusory allegations in support of her claim for negligent retention and supervision. For instance, Plaintiff fails to provide facts in support of [the co-worker's] incompetence, her alleged injuries, and that [her employers'] retention of [the coworker] caused Plaintiff's injuries." *Id.* at \*24-25.

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 36 of 44

532, 546 (E.D. Pa. 2023)(considering a negligent hiring claim). However, a plaintiff must show that the employee's prior bad acts would have put a reasonable employer on notice of the employee's propensity to injure others. *Fusco* at *11*.

Plaintiff argues that on the basis of Valadez learning of Shows' texts threatening Plaintiff, Valadez had actual knowledge that Shows possessed a dangerous tendency at that point and nevertheless negligently declined to terminate him.[40]   The Court finds it plausible that Valadez could have taken *some other action* in response to Show's texts, however, Plaintiff's allegations fall short of the necessary conduct or history that would put Defendants on notice that Shows was unfit or incompetent by way of a propensity for violence.

### 4. Defendants' act or omission causing Plaintiff's alleged injuries and proximate cause

---

[40] Plaintiff cites to *Tallahassee Furniture Co. v. Harrison*, for support, but the case is distinguishable from the instant matter. 583 So. 2d 744, (Fla. Dist. Ct. App. 1991). *Tallahassee* involved an employee who raped a customer that he had previously delivered furniture to on behalf of his employer furniture company. *Tallahassee* dealt with an employer's duty to make inquiry with respect to safety when giving its employee "the indicia of authority" to enter into the living quarters of others. The court found that defendant owed the duty to conduct an investigation of the employee's background before hiring him. As to the element questioning the employer's knowledge of the employee's incompetence, the court in *Tallahassee* found sufficient evidence to support a negligent retention claim where, unlike the instant case, the evidence showed that appellant employer "knew of the employee's past criminal record and should have been aware that he was unsuitable for customer contact positions." *Id.* at 747. Unlike the instant matter, the plaintiff in *Tallahasee*, presented extensive evidence including proof that the employee had a juvenile record for armed robbery and burglary; adult records of arrest for assault and battery; a charge of aggravated battery; a conviction for battery involving cutting his former wife in the face with a knife; additional charges of battery on his wife; and voluntary hospitalization for psychiatric problems on two occasions with a diagnosis of paranoid schizophrenia, including reported delusions of voices telling him to kill himself and to kill other people. *Id.* at 749. In addition, the employee had been fired by his prior employer. He was also examined by two court-appointed psychologists and found incompetent to stand trial. One of the psychologists testified that Turner was making bizarre comments, hearing voices, and seeing people when there was no one present. Also, testimony by representatives of management confirmed that had they known of the employee's prior criminal record, his drug addiction, and psychiatric illness, he would not have been hired as a deliveryman; however, the defendant's standard employment application form was never submitted to the employee. The form included a question requesting the applicant to disclose whether he had a personal history, even if slight, of drug addiction, nervous disorders, or psychiatric care, among other things. The form also included the question, "Have you ever been convicted of a crime?" and "If Yes, please explain." The form also requested a "yes" or "no" answer to the question, "Have you ever been arrested?" followed by the instruction, "If Yes, give details (omit minor traffic violations)." *Id.* At least two of the defendant's representatives testified that it could be assumed that if the employment application had been requested, the employee would have furnished the information requested. The defendant "conducted no job interview, nor did it obtain a written employment application from the employee, notwithstanding the fact that the company had on hand application forms which it generally used." *Id.* at 752.

Plaintiff argues that the negligent retention of Shows was the proximate cause of physical, mental, and employment harm he incurred and that he suffered economic damages flowing from that alleged harm. Plaintiff argues that he was struck in the face by Shows because Valadez did not investigate, report or immediately terminate Shows after Plaintiff reported the texts. (ECF No. 17 ¶¶40, 59.) Plaintiff alleges that as a result of the affray between himself and Shows he incurred 1) physical and mental injury, and 2) loss of his job. (*See* ECF No. 17 ¶ 84.) Plaintiff asserts that Defendants failed to recognize Plaintiff was subjected to workplace violence and that if the incident with Shows had not occurred, he would not have lost his job.

Generally, the gap between knowledge and action is where negligence is most evident. Plaintiff maintains that "failure to take timely action to fire Shows. . . . created an unreasonable risk of bodily harm to Plaintiff and was the cause of [his] injuries." (ECF No. 379 at 2.) But Plaintiff is tasked with demonstrating that retention of Shows was the proximate cause of his alleged injuries and he fails to do so.

"Proximate cause is established where the party who bears the burden shows that an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act." *Id.* at 332. "Proximate cause is ordinarily a question to be determined by the jury as a fact in view of the attendant circumstances. But if the evidence be so slight as not reasonably to warrant the inference of proximate cause, the court will not leave the matter to the speculation of the jury." *Id.* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp.*, 477 U.S. at 323-24. A plaintiff must plead facts "sufficient to create a triable issue for a jury *on whether the damages they sustained were the natural and probable consequence of, and part of a natural and continuous sequence stemming from, the defendant's negligence.*" *Miller* at 332. (emphasis added). Prima facie evidence amounts to evidence "that will establish a fact or sustain a judgment unless contradictory evidence is produced." Black's Law Dictionary (12th ed. 2024).

For a successful negligent retention claim, not only must an employer have known or had reason to know of a particular, incompetence or dangerous attribute of the employee,

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 38 of 44

but the employer must also have been able to reasonably have foreseen that such qualities created a risk of harm to other persons. In addition, the employee's incompetence or dangerous characteristics must have proximately caused the alleged injury by way of the employer's negligence. "[I]n a proximate cause analysis, the standard by which foreseeability is determined is that of looking to the natural and probable consequences of the act complained of." *Miller*, 75 V.I. at 337 (citation omitted); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 419, (2011) ("Proximate cause requires some direct relation between the injury asserted and the injurious conduct alleged, and excludes links that are too remote, purely contingent, or indirect.") (citation modified); *Maddox v. City of Newark*, 50 F. Supp. 3d 606, 636 ("A plaintiff must show that the person's prior conduct somehow foreshadowed the actual harm she suffered.")

Foreseeability essentially assesses whether a reasonable person could have anticipated the potential consequences of the alleged negligent action.[41] Take, for example, the two consolidated actions in *Miller v. V.I. Wheel Estate* addressing damage incurred during Hurricane Maria in 2017. One of the plaintiffs demonstrated proximate cause and the other did not. In *Miller*, mobile home units owned by the defendant were blown loose from their foundation and one of them crashed into the side of the trailer where one plaintiff resided on an adjacent lot. No one was physically present at the site during the storm. The plaintiff

---

[41] Plaintiff fails the foreseeability test. First, as addressed earlier, prior to January 26, 2019, Shows had not displayed any "particular unfitness, incompetence or dangerous attributes." Plaintiff presents no evidence that Defendants had constructive knowledge of any "incompetence" or propensity for violence on Shows' part, and therefore no evidence Defendants could reasonably have foreseen of a risk of harm to other persons. Moreover, as QA Inspectors, Shows and Plaintiff were never scheduled to work on an assignment together. (ECF No. 449-2 at 5 Valadez Dep.) Valadez instructed Plaintiff to stay away from Shows. (ECF No. 449-2 at 5 Valadez Dep.) The only possible point that they would be together was at the brief muster in the early morning when assignments were received. (ECF No. 449-2 at 5 Valadez Dep.) Otherwise there was never any one point where the inspectors were together other than if they chose to be close to each other. (ECF No. 449-2 at 5 Valadez Dep.) In the evening employees were "coming and going, everybody had different schedules. Some people didn't report back to the muster. Some people went directly back," depending on their individual schedules, and how long appointments lasted. (ECF No. 449-2 at 5 Valadez Dep.) To the extent Plaintiff claims Defendants had a duty to take immediate action against Shows—not only was the record void of previous violent behavior by Shows, but it is void as to when Shows presented an immediate foreseeable danger. As Defendants point out, "the first time Shows is placed in the area is *after* Plaintiff showed Valadez the text messages, *after* Plaintiff went into the Witt office to get his work assignment for the day, *after* he went outside and got into a vehicle." (ECF No. 446 at 5.)

filed suit attributing the damage to her home to the negligence of the defendant homeowner. Plaintiff alleged that the defendant was negligent for failing to inspect and maintain the straps and anchors tethering its unit, and that this in turn caused the trailer to become unsecured from its foundation thereby causing the damage to Plaintiff's property. *Miller*, 75 V.I. at 335. Plaintiff had to demonstrate that the damages sustained in the storm were proximately caused by the failure to secure the mobile home to its foundations. Because "the capability of rusted straps and anchors to secure a unit to its foundation (and ultimately whether their failure was a proximate cause of her damages) was directly dependent on an understanding of specific metallurgical principles," the Court found Plaintiff failed to produce "actual evidence" or identify "potentially admissible proof of the causal relationship between the manner by which [the defendant] secured and maintained the anchoring system to its unit" and the damages Plaintiff claimed. *Miller* at 332-33, 380. The plaintiff had asserted that the proximate cause could be determined by the wear and tear of the metal straps and anchors—which were rusted. However, the Court held that such asserted proof required scientific, technical, or other specialized knowledge to firmly establish the link for proximate cause—because rusted metal straps breaking apart due to a hurricane requires expert testimony about the straps' metallurgical properties. *Miller* at 341, 344 ("metal undergoes changes in its metallurgical properties and composition"). Nonetheless, in the second case where a nearby unit was damaged, expert testimony was not required, since the plaintiff's observation that the straps at issue *were completely broken off*—and not just rusted—clearly indicated that the straps were physically incapable of securing the mobile home—whether they were rusted or not—so that their metallurgical properties were not at issue. *Id.* at 332. The record, viewed in the light most favorable to the first Plaintiff as the nonmoving party, included no such direct evidence of the condition of the "anchors" or means by which the other unit was secured to its foundation prior to and at the time Hurricane Maria struck St. Croix. Only an expert could establish the required direct link showing that the damage was the "*natural and probable consequence*" of the negligence asserted. The plaintiff's non-expert allegation was insufficient to prove the element of proximate causation without this direct link.

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 40 of 44

Similarly, in the instant matter, Plaintiff fails to present a "direct link" between the injuries he asserts and the conduct of negligent retention that he alleges. Plaintiff fails to demonstrate how his alleged damages are a "natural and probable consequence of, and part of a natural and continuous sequence stemming from," negligence on Defendants' behalf.

First, Plaintiff provides no evidence of physical or mental injury. Plaintiff did not see a doctor or psychologist or go to a hospital, and he provides no medical records of any kind. (ECF No. 449-1 at 20, Pl. Dep.) Gregory Elizondo, who saw Plaintiff right after the incident, stated that he did not notice any bruises or scrapes on Plaintiff. (ECF No. 342-8 at 6, Elizondo Dep.) Plaintiff's own expert testified that Plaintiff suffered no disability, no cognitive or physical injury, and that he was in good health and able to work. (ECF No. 449-12 at 8, 37, Test. of Christino Phillip Reyes.)

Second, as for his removal from assignment, Plaintiff was an at-will employee. Plaintiff's removal from his assignment is not a harm for which Plaintiff is eligible or legally entitled to receive repayment, compensation, or reward for in light of his at-will status. He could be fired at any time for any reason or for no reason at all. As an at-will employee, Plaintiff had no legitimate expectations of future earnings or loss of wages at termination. Plaintiff alleges he suffered monetary damages from loss of real estate investment income that he had pending at the time he was "wrongfully terminated"—but he was not wrongfully terminated. (ECF No. 379 at 11.) Plaintiff's inventive approach appears to be little more than an attempt to circumvent the strictures of the employee-at-will doctrine. *See Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1328-30 (N.D. Ga. 2009) (citing *Farrell v. Time Service, Inc.*, 178 F. Supp. 2d 1295, 1300 (N.D. Ga. 2001) ("Moreover, an at-will employee cannot allege a claim for negligent hiring, retention or supervision based on an allegedly improper discharge.")[42]

---

[42] In *Anderson*, Plaintiff was an at-will employee alleging, *inter alia*, discriminatory termination and negligent retention against Defendant—her former employer—after she was discharged from her position with the company. Plaintiff asserted that she was harassed by her superiors and that Defendant employer had been aware. *Id.* at 1328. "Under Georgia law, 'a defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's "tendencies" or propensities that the employee could cause the type of harm sustained by the plaintiff.'" *Id.* at 1329 (citing *Tomczyk v. Jocks & Jills Restaurants, LLC.*, 198 Fed. Appx. 804, 815 (11th Cir. 2006). "A plaintiff states a claim for negligent . . . retention if 'the employer, in the

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 41 of 44

Plaintiff asserts that "[t]he injuries on which [he] bases his lost future earning capacity [are] loss of income, loss of rental income, loss of appreciation on the property, [and] lost wages.'" (ECF No. 379 at 8.) But as WOB points out, Restatement (Second) of Torts § 906 states damages for lost earning capacity "will not be awarded without proof of pecuniary loss."[43] (ECF No. 338 at 7.) "Comment *c* thereto clarifies, '[l]oss in earning capacity may result from an imprisonment or from a harm to the body, as when there is a physical impairment, from harm to the mind, as when the injured person suffers a nervous shock, or from harm to the reputation as when, because of defamation, a person has been prevented from obtaining profitable employment.'" *Id.*

Plaintiff fails to present prima facie evidence to support his assertion that his alleged economic damages were a foreseeable and actual result of his altercation with Shows *or* his termination as an at-will employee. The harm that Plaintiff alleges is not a foreseeable consequence of Shows' or Valadez's actions on the morning of January 26, 2019. Plaintiff provides no *direct* evidence by which the damages he claims were linked to the negligent retention of Shows. Plaintiff's evidence is too "slight" to warrant the inference of proximate cause. *See Miller* at 332. The bottom line is that Plaintiff fails to establish a legal duty owed that was breached by Defendants and which constitutes a factual and legal cause of *any* of

---

exercise of reasonable care, should have known of an employee's reputation for [gender and racial] harassment and that it was foreseeable that the employee would engage in [gender and racial] harassment of a fellow employee but he was continued in his employment.'" *Id.* (citation omitted). The *Anderson* Court found that to the extent that Plaintiff claimed her termination following her maternity leave "was a proper basis for asserting a claim of negligent hiring and retention," the claim had no merit because "she does not allege that she was anything more than an employee-at-will. As such, any claim for negligent hiring and retention must fail." *Id. at* 1330 (citing Georgia cases). The Court found that Plaintiff's claim failed in addition because negligent retention is a derivative claim under Georgia law and her underlying tort claim failed. The Court also determined that Plaintiff failed to produce any evidence to show that Defendant employer "knew or had reason to know" that any of the individually named employees were engaged in harassing behavior. *Id.*

[43] "Compensatory damages that will not be awarded without proof of pecuniary loss include compensation for:

(a) harm to property,
(b) harm to earning capacity, and
(c) the creation of liabilities."

Restat 2d of Torts, § 906.

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 42 of 44

Plaintiff's alleged damages.[44] Even if negligence could be found in the level of care exercised to protect against foreseeable harm here, Plaintiff fails to define any real harm on which to base damages.[45]

---

[44] Plaintiff cites to *Holt v. Home Depot USA, Inc.* 135 F. App'x 449, 449-50 (2d Cir. 2005) for the premise that at-will employment does not automatically bar a claim for future wage loss, but *Holt* is distinguishable. The plaintiff in *Holt* claimed promissory estoppel, and—unlike here—the court in *Holt* found that a jury could properly find that the plaintiff-appellee reasonably relied on a clear and definite promise. In addition, the *Holt* court found sufficient evidence to allow a jury to conclude that the plaintiff-appellee was retaliated against. Retaliation is not at issue here. Plaintiff also cites to *Chase v. V.I. Port Authority*, 3 F. Supp. 2d 641, 642 (D.V.I. 1998). *Chase* is also distinguishable. The court in *Chase* denied summary judgment as it related to negligent retention because the at-will employee plaintiff in *Chase* presented clear evidence that on *numerous occasions* before his assault, the supervisor acted in such a hostile manner as to put the employer on notice of his potential to create an unreasonable risk of bodily harm to others. We do not have that here.

[45] Briefly defined, 'damages' refers to "compensation for a legal injury sustained," and may generally be recovered only where they result from a loss or injury actually sustained. *Frankel v. United States*, 321 F. Supp. 1331, 1347 (E.D. Pa. 1970), *aff'd* 466 F.2d 1226 (3d Cir. 1972). The Restatement (Second) of Torts defines compensatory damages as "the damages awarded to a person as compensation, indemnity or restitution for harm sustained by him." Restatement (Second) of Torts § 903. "Generally, a tortfeasor is liable for all injuries and losses *which are proved to be the natural and probable results of the tortfeasor's wrongful act.*" 1 Damages in Tort Actions § 1.01 (2026) (emphasis added). "While it is true that the terms 'damages,' 'damage,' and 'injury' have sometimes been used interchangeably, they are quite distinct legal concepts. 'Injury' refers to a wrongful act or tort or violation of some legal right. 'Damage' is the harm, or loss, sustained by reason of the injury. 'Damages' is the term used to denote the amount awarded as compensation for loss sustained because of the injury." *Id.* The law recognizes the distinctions between damages and injury, and not all injuries or breaches result in damages. "[I]t has often been said that no action will lie when the act is *damnum absque injuria*, that is, when harm or damage is sustained without violation of a legal right. Similarly, no action will lie when the injury produces no damage (i.e., *injuria sine damno*)." *Id.* However, "[a]n exception to this rule is that nominal damages may be awarded in the absence of proof of damages where there is proof that an injury occurred." *Id.* In substance, Plaintiff fails to prove that he sustained damage—"harm"—as a result of Defendants' negligence. According to Plaintiff, the alleged injury—or wrongful act—was the failure to immediately fire or remove Shows after Plaintiff brought the threatening texts to Valadez's attention the morning of January 26, 2019. Plaintiff couches this as Defendants' negligent failure to maintain a safe workplace. Restatement § 910 provides "One injured by the tort of another is entitled to recover damages from the other for all harm, past, present and prospective, legally caused by the tort." But a plaintiff is not entitled to resort to conjecture and speculation. "A plaintiff has the burden of providing some evidentiary and logical basis for calculating or, at least, rationally estimating a compensatory award." *Thomas Hyll Funeral Home v. Bradford*, 233 F. Supp. 2d 704, 706 (D.V.I. 2002) (citation omitted). The plaintiff must produce "corroborative proof of loss of earnings and earning power." *Id.*

For the sake of argument, even if Defendants were found to be negligent between the time Plaintiff showed the threatening text messages to Valadez and the point in which the altercation ensued, "it is, nonetheless, well-established in the common law that there is no valid cause of action where there is shown to exist, at the very most, a 'wrong' without 'damage'." *McIntyre v. McCloud*, 334 So. 2d 171, 172 (Fla. Dist. Ct. App. 1976); *see also Scott-Steven Dev. Corp. v. Gables by Sea, Inc.*, 167 So. 2d 763, 764 (Fla. Dist. Ct. App. 1964) ("Not all breaches [of contract] result in damages and the law furnishes a remedy only for such wrongful acts as result in injury or damage."). "A plaintiff is entitled to compensatory damages only if 'he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit.'" *Cifre v. Daas Enterprises, Inc.*, 62 V.I. 338, 353 (V.I. Super. Apr. 24, 2015) (citing *Maso v. Morales*, 57 V.I. 627, 635 (V.I. 2012) (relying on the Restatement (Second) of Torts §

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 43 of 44

Accordingly, Defendants are not liable for financial harm Plaintiff may have incurred as a result of being removed from his assignment. Moreover, Plaintiff's claims of damages are speculative.[46] The Court finds Plaintiff has not made a showing of harm—physical or otherwise. Drawing all inferences in favor of Plaintiff, the facts on record do not support a viable claim for negligent retention. The Court finds that Defendants are entitled to summary judgment on Plaintiff's negligent retention claim for three reasons. First, Plaintiff has failed to present any evidence to show that Defendants "knew or had reason to know" that Shows demonstrated a propensity for violence. Second, Plaintiff's asserted injury and damages are too remote, indirect, or unforeseeable to hold Defendants liable. Plaintiff cannot prove that any act or omission of the Defendants caused the damages he claims. He "may not rely upon mere allegations of proximate cause but must present actual evidence upon which a jury could find that [Defendants'] negligence was the legal cause of damages incurred." *Miller*, 75 V.I. at 375. Third, Plaintiff's alleged damages as an at-will employee are not foreseeable as a matter of law. To the extent that Plaintiff claims that his termination following the incident is a proper basis for asserting a claim of negligent retention, this claim has no merit. As

---

912) (1979)). The Court finds neither compensatory nor punitive damages are warranted here. This stems not merely from the Court "having the final word on damages," (ECF No. 377 at 19), but from the Court's finding that no genuine dispute of material fact exists as to whether damages are owed because Plaintiff fails to introduce sufficient evidence to prove damages. *See Atl. Human Res. Advisors, LLC v. Espersen*, 76 V.I. 583, 621 (2022) ("As a threshold matter, a claim that a plaintiff failed to introduce sufficient evidence to sustain a compensatory damage award is necessarily different from other challenges to the amount of damages. Since compensatory damages are often an element of a cause of action, the failure of the plaintiff to introduce sufficient evidence to prove damages will result in dismissal of the cause of action and judgment entered in favor of the defendant, just as would be the case with respect to the failure to prove any other element.").

[46] *See* Speculative Damages, Black's Law Dictionary ("Damages that are so uncertain to occur that they will not be awarded. — Also termed *remote damages*."). Even a nominal award is inappropriate here in light of Plaintiff's failure to establish a loss. Black's Law Dictionary defines nominal awards as:

> 1. A trifling sum awarded when a legal injury is suffered but there is no substantial loss or injury to be compensated.
> 2. A small amount fixed as damages for breach of contract without regard to the amount of harm. . . . "Nominal damages are awarded if the plaintiff establishes a breach of contract or a tort of the kind that is said to be 'actionable *per se*' but fails to establish a loss caused by the wrong. In the case of tort not actionable *per se* as, for example, negligence, if the plaintiff fails to establish a loss, the action will be dismissed. The practical significance of a judgment for nominal damages is that the plaintiff thereby establishes a legal right." S.M. Waddams, *The Law of Damages* 477–78 (3d ed. 1997).

*Rich v. Witt O'Brien's USVI, LLC, et al.*
Case No. 1:19-cv-0022
Memorandum Opinion
Page 44 of 44

discussed above, Plaintiff was an employee-at-will. As such, his claim for negligent retention must fail. Accordingly, summary judgment will be granted as to Plaintiff's negligent retention claim.

## IV.    CONCLUSION

For the reasons discussed above, the Court finds Defendants have carried their burden under Rule 56 of showing that no genuine dispute of material fact exists as to the causes of action alleged in the First Amended Complaint. Plaintiff's status as an at-will employee is a crucial fact that is fatal to his remaining claims. He cannot circumvent that status by filing a wrongful termination claim cloaked under the guise of fraudulent misrepresentation or the negligent retention of another employee. Accordingly, summary judgment is appropriate on all remaining counts and will be entered in favor of Defendants.

An appropriate order follows.


**Dated:** April 28, 2026                    /s/ *Robert A. Molloy*
                                             **ROBERT A. MOLLOY**
                                             **Chief Judge**